Argued February 15; reversed March 28; rehearing denied
May 16, 1933

RUGGER ET AL. *v.* MT. HOOD ELECTRIC CO.

(20 P. (2d) 412, 21 P. (2d) 1100)

*P. J. Gallagher,* of Portland (Cecelia P. Gallagher, of Portland, on the brief), for appellants.

*William D. Bennett* and *Howard E. Green,* both of Portland, for respondent.

BAILEY, J.  On May 19, 1928, articles of incorporation of Mt. Hood Electric Company were filed with the corporation commissioner of this state.  The capital stock was divided into five hundred shares of common and twenty shares of preferred, of the par value of $100 per share, and four hundred eighty shares of

stock of no par value. On May 31, 1928, when the first meeting of the stockholders was held, the following number of shares had been subscribed for: John S. Shute, eight shares of common and twenty shares of preferred stock; J. W. Myers, three hundred eighty shares of common and twenty shares of stock of no par value; and one share each of common stock was subscribed for by two other individuals.

At this meeting of the stockholders a resolution was passed providing for a board of seven directors, which provision was incorporated in the by-laws, and the four stockholders above mentioned were elected as members of the board, leaving three vacancies. Another resolution was adopted, authorizing the filing of supplementary articles of incorporation increasing the preferred stock from twenty shares to two hundred fifty shares of the par value of $100 a share, and reducing the stock of no par value from four hundred eighty shares to two hundred fifty shares. The original articles of incorporation provided that the amount of capital which was required to be paid in, either in cash or property at its fair cash value, before the corporation could begin doing business, should be $10,000, and the supplementary articles of incorporation, authorized at this meeting, reduced that amount from $10,000 to $1,000. The directors were also authorized to fix the price at which the stock of no par value could be sold by the corporation, but at not less than $25 per share. Thereafter and on or about July 31, 1928, supplementary articles of incorporation were filed making the changes authorized at the first meeting of the stockholders.

The principal object of this corporation appears to have been to take over, complete and operate a partly constructed electric transmission and distributing sys-

tem from the east boundary of the town of Sandy to Rhododendron and adjacent territory, occupied largely by summer homes. J. W. Myers was the moving spirit in the organization of the company and in the subsequent development of the transmission and distributing system. Prior to the incorporation of the defendant company he and others had been interested in the Loop Electric Corporation, which had commenced the construction of a transmission and distribution system, the one involved herein, from Sandy east along the Mt. Hood highway, had purchased and set in the ground most of the poles from Sandy to Alder Creek, a distance of about nine miles, and had procured and distributed additional poles along the proposed line east of Alder Creek.

In carrying out its program the Loop Electric Corporation had borrowed from one Roy Keagy the sum of $2,700, and upon failure to pay the same action was brought by Keagy against the Loop Electric Corporation. The property of that company was attached, sold on execution and purchased by Keagy for the sum of $250.

Prior to or about the time of the incorporation of the defendant company J. W. Myers had entered into negotiations with Keagy for the purchase of the property which the latter had acquired on execution sale. An understanding was had between the two to the effect that Myers would organize a corporation and would transfer to Keagy twenty shares of preferred and thirty-four shares of common stock in that corporation in payment for this property.

On or about June 1, 1928, John S. Shute, pursuant to an agreement he had with Myers, began to advance money to the defendant corporation for the completion of the electric system to Alder Creek and, according to

Shute's testimony, did advance in all the sum of $3,319, but the record fails to disclose how much of that amount was advanced by Shute before August 1, 1928. By that date the line from Sandy to Alder Creek had been completed, with funds furnished by Shute for that express purpose, and was furnishing service to a few patrons, not to exceed ten in all.

On the last mentioned date at a meeting of the board of directors of the defendant corporation Myers offered to transfer to the corporation the property acquired by Keagy on execution sale, the services of his own attorney for two years and certain contracts, in full payment for the $40,000 worth of stock subscribed for by himself, his offer being as follows:

"I hereby offer the property listed below belonging to me and located on the Mt. Hood Loop highway in Clackamas county, Oregon, and being an electric line partly constructed and partly not constructed under a franchise issued by the state highway board of the state of Oregon; the property thus referred to is covered by the list referred to and marked Exhibit A, and I offer same to your company for the amount of stock subscribed to by me, both common and no-par.

"And included with said offer and to accompany same and be transferred to your company should this proposal be accepted is all machinery, tools, equipment and materials now upon the ground and used in the erection of the line now in process of construction; the same to be sold to you as a going concern and also all property being free and unencumbered, and of the reasonable value of $40,000".

Exhibit A referred to in the foregoing is as follows:

"All light and power poles, standing and down, with all braces and cross arms thereon or on the ground; all easements and easement papers, instruments and rights; all books and papers, records, sta-

tionery and reports; orders of the public service commission, if any right of way contracts; and all tools and machinery; all wire and wires, braces, ropes, etc., franchises and permits to build granted by the state highway commission of the state of Oregon, under which said line is erected; together with renewal rights incident to same, and especially a permit to construct, operate and maintain a power pole line on and along the right of way of Mt. Hood Electric Co. granted by the Oregon state highway commission January 5, 1925, and accepted and approved by the former Loop Electric Power Company, December 27, 1927, and which was assigned to the Loop Electric Company heretofore and bought up at public sale by Roy H. Keagy, of Portland, Oregon;

"All contracts with customers~now being served with electric current and all contracts for current and power; all moneys due or accruing, or growing due from customers for current or otherwise; all accounts due and owing and all moneys on hand, if any;

"Also, I offer to accompany this offer the services of my attorney for a period of two years beginning with the 1st of January, 1928, to be rendered this company without further compensation in the way of money from the company.

"(The above line is erected and in operation from Sandy to Alder Creek on the Mt. Hood Loop highway, at present. All wire for current transmission and for guy wires and guy poles is erected and in place and all in full operation between the points above mentioned.)"

This offer was accepted by the board of directors, consisting of four members, including J. W. Myers, who was to receive three hundred eighty shares of common and twenty shares of no-par stock for the property offered by him to the corporation; John S. Shute, who was to receive from Myers ninety shares out of the three hundred eighty shares of common stock issued to the latter; the personal attorney and

brother-in-law of Myers, who was to receive fifty shares of common stock for his services from January 1, 1928, to December 31, 1929; and a fourth director, who subscribed for one share of stock, to qualify as a director in order to constitute a quorum of the board of directors.

After accepting the proposition of Myers and at the same meeting a resolution was adopted that the corporation procure from the corporation commissioner of the state of Oregon a permit to sell $10,000 worth of preferred stock of the defendant company. On August 9, 1928, the corporation commissioner granted authority to the corporation to sell that amount of its preferred stock before August 1, 1929, which license does not appear to have been renewed or extended beyond the original time limit, nor does there appear any permission to dispose of the stock sold in excess of the $10,000 specified in the permit. When the amended complaint was filed there was outstanding $17,100 of preferred stock, of which amount plaintiffs were the owners of one hundred fifty-three shares. According to the testimony, twenty-six shares of preferred stock were issued by the corporation to Shute, for money advanced by him to complete the line to Alder Creek, and twenty shares of preferred stock were issued to Myers pursuant to a resolution of the board of directors adopted August 16, 1928, in exchange for his twenty shares of no-par value stock, and by him transferred to Keagy. One hundred twenty-five shares, therefore, were apparently sold by the corporation direct to the plaintiffs other than Keagy. As the plaintiffs owned one hundred fifty-three shares of the one hundred seventy-one shares of preferred stock issued by the company, it is evident that Shute must have sold at least eight shares of his stock to them.

On April 16, 1931, a special meeting of the board of directors was held, at which time the secretary-treasurer of the company tendered his resignation. Another individual was first elected a director and thereafter was elected secretary-treasurer of the company. The retiring secretary-treasurer then presented a claim for services rendered by himself to the company for the year 1930 and the first three months of 1931 at the rate of $150 per month. It appears from the record that all directors present, including the retiring secretary-treasurer, voted in favor of allowing this claim, and the chairman declared the claim had been allowed.

A motion was next made that Myers be allowed compensation for his services to the company at the rate of $150 per month from May 31, 1928, to May 31, 1929, and that thereafter until the further order of the board of directors a salary of $250 per month be paid him. The record shows that Myers and his brother-in-law cast the only votes in favor of his claim, that Shute voted against it and that one of the directors declined to vote. Shute gave as his reason for voting against the claim of Myers that the stock that Myers "had received from the company was adequate compensation for all his services rendered to the company to and including January 1, 1930, and also on the ground that rent and maintenance which had been paid to him were ample compensation for his services and that he should receive only the sum of $150 per month from January 1, 1930," to the date of the meeting; and that there should be "deducted from that amount money paid to him for rent and maintenance". The chairman of the meeting then announced the claim of Myers for compensation had been approved.

A motion was next made and seconded that the incoming secretary-treasurer be paid a salary of $150 per month beginning April 16, 1931, the date of the meeting. In favor of this motion were two votes, those of Myers and his brother-in-law. Shute voted against the motion and the other director did not vote. Following the course taken in allowing the other claims, the chairman announced the motion carried. Shute then explained as his reason for voting against the motion that a certified public accountant could be employed to keep the books and records of the company and make all collections at a cost of not to exceed $50 per month. The fourth director, who had declined to vote, thereupon tendered his resignation, which was accepted.

The minutes of the special meeting held by the board of directors on April 16, 1931, fail to disclose more than the original four directors present at any time during the meeting, and although a fifth director was elected at this meeting his name is not mentioned anywhere as being present or as voting for or against the different resolutions and motions above mentioned. It is reasonable to assume that had he qualified and taken part in the deliberations of the board of directors, that fact would have appeared in the minutes, which frequently mentioned the names of the other four directors and gave details of their voting on numerous matters coming before the board. The brief of respondent bears out this assumption, for it states in reference to this matter that "the directors, on April 16, 1931, when the compensation was voted, were the identical persons who were the directors on August 1, 1928, when the services" of the secretary-treasurer and attorney for the company "were accepted and they made the deal with Myers to secure" this officer and

attorney's services and knew the amount he was to receive therefor. Moreover, counsel for defendant stated during the oral argument that there were four votes cast, including that of the secretary-treasurer, and since the record discloses that all the directors voted, it is evident that the newly-elected director had not qualified at the time this vote was taken.

No dividends have ever been declared by the defendant corporation, but there has been paid to the preferred stockholders out of the $8,436.64 received on customers' contracts toward the expense of connecting their premises with the system the sum of $1,651.68, and the use of this money in this manner is designated as payments made in lieu of dividends. In referring to the $8,436.64 received from customers on their contracts, the secretary-treasurer of the corporation testified:

"That is an investment that he [the customer] makes, and the only way he gets that money back, we will go in, say, to Alder Creek; we make a survey and figure we can't go in there for less than ten customers; in other words, we have to get ten customers to get in there; they have to put up $40 apiece—$39.75, as it is in Alder Creek. We collect $39.75 from ten people. Then when the eleventh man comes on that $39.75 that the eleventh man pays in we deduct $18 for his meters and his hook-up, the labor and stuff to hook him up, and the balance of the money, or $21.75, is rebated back to those ten who came on first. They get two dollars and something back on that, and eventually if we get fifty or sixty on there they would get their money virtually back".

The payments "in lieu of dividends" made from this fund, however, were not made uniformly to the preferred stockholders, as one of the stockholders testified that the company was delinquent on his stock dividends three payments, another testified that the

company was delinquent on his stock two dividends, and a third, that he had received all of his dividends except one.

On May 28, 1931, the annual meeting of the stockholders was held. The minutes recite that four hundred forty-five shares of common stock were entitled to participate in the meeting and that there were present owners of three hundred twenty-five shares of common stock. The record of the meeting reads in part as follows:

"Thereupon, Roy Keagy stated to the chairman that he had learned from what he considered reliable sources that certain of the preferred stockholders had received the return on their investment for the period of January 31, 1931, and that he had not as yet received the company's check on his investment, and that he wished to enter an objection to the payment to any stockholder unless they were all treated in like manner.

"There was no other discussion of the matter and the chairman announced that the objection made by Roy Keagy should be entered as a part of the minutes.

"Thereupon, B. W. Thorne stated that he had been told that salaries for services rendered by J. W. Myers prior to April 16, 1931, had been voted in the sum of $7,800, and that he had also understood that" the former secretary-treasurer "had been voted for his compensation for the fifteen months period ending March 15, 1931, the sum of $2,250, and that he wished to voice his objection to such allowances. The matter was then opened for discussion and John S. Shute said that he had likewise objected to these allowances.

"Thereupon, Mrs. G. Cladek said that she objected to such allowances until the stockholders had been paid their interest on their investment".

Nothing, however, was done concerning the matter about which complaints were made.

Plaintiffs ask that the directors of the corporation be enjoined from paying the claims for salaries above referred to, and that a receiver be appointed for the

purpose of taking appropriate action, either to collect the unpaid balance on the common stock which has been issued or to have the stock certificates representing said shares canceled. The request is that a receiver be appointed for these specific purposes only, not for liquidating or winding up the affairs of the company. There is the usual prayer for such other and further relief as the court may deem just and equitable.

The offer made by Myers and accepted by the company was to turn over the property which was bought on execution sale by Roy Keagy, and in addition thereto all contracts with customers who were then being served with electric current, all contracts for current and power, all moneys due or accruing or becoming due from customers otherwise, all accounts due and all money on hand, if any. Myers also offered the services of his attorney for a period of two years beginning January 1, 1928, "without further compensation in the way of money from the company". From the record it appears that there was no money on hand and little, if any, money due the company at the time the transfer was made, and very few contracts with customers. We therefore have to consider mainly the value of the property received by Myers from Keagy and the value of the services of his personal attorney, who was also his brother-in-law. Referring to the testimony of Myers, we find that he had received from Keagy and transferred to the corporation two hundred eighty poles set in place from Sandy to Alder Creek, with the possible exception of one-quarter of a mile. These poles together with the cross arms were computed by Myers to be worth $20 each, or a total of $5,600. There were also two hundred seventy unset poles scattered along the right of way east of Alder Creek, estimated by Myers to be worth $2,160. In ad-

dition thereto were the hoist and other equipment valued at $1,800. The hoist or, as it was sometimes referred to, hoister, ''consisted of a truck with the gin-pole on the back of it and ropes, blocks, tackle, guy wires and cable, and one thing and another necessary to hoist a pole and put it in the ground,'' and was valued at $500 or $600, although it had been donated to the Loop Electric Corporation by the Portland Electric Power Company. It had been necessary to do certain surveying, to prepare maps and charts of the right of way, and to procure permission from the state highway commission to set the poles on the right of way of the Mt. Hood Loop highway. This permission is often mentioned in the record as a franchise. Easements were procured in a few instances for poles and line where the line crossed and the poles were set on private property. No definite value was placed upon these items nor was the cost thereof shown except the payment of $5 or $10 to cross one tract.

Mr. Myers stated that in his opinion the value of the first nine miles of the line, from Sandy to Alder Creek, was between $2,500 and $3,000 per mile, and that he consider the value of the physical property which he turned over to the corporation in exchange for $40,000 worth of paid-up stock to be $34,414. The difference between the value of the physical property and the value of the stock represented, he said, the time that he had put in for the Loop Electric Corporation since 1925.

Mr. U. E. Nelson was called as a witness for the defendant corporation and after stating that he was a civil engineer, was one of the organizers of the Loop Electric Corporation and had been connected with it until all its property had been taken away from it by Keagy on execution sale, testified that he considered

the total value of the property of the Loop Electric Corporation and the cost thereof to have been about $7,000. This included surveying, engineering work, material, maps, poles and other items. In this total he placed a charge for personal services rendered by himself, Mr. Myers and others connected with the Loop Electric Corporation. The total, however, did not include the $2,700 obtained from Roy Keagy, concerning which there is some doubt as to whether or not the money actually went into the property.

Mr. W. W. Jones, electrical engineer, in answer to a hypothetical question stated that he estimated the value of the first nine miles of line completed between $3,000 and $3,500 a mile and that this estimate was based upon his experience had with utility companies. He included in that value, he explained, overhead expense which in this instance would be at least 30 per cent of the total of his estimate, and stated that this overhead was made up of insurance and general office expense. Later, however, he modified his testimony regarding overhead expense by saying that it would probably amount to $600 or $700 per mile, and that the amount of overhead on ten miles of construction was nearly as much as it would be on one hundred miles of like construction.

There is other testimony in the record to the effect that the digging of holes for pole-setting on the first nine miles was done on a contract at $1.25 per pole, and that the poles could be bought, painted and set on the first nine miles of the system at an average of $10 per pole. The poles which were set along the highway were bought and delivered for $6 each, according to another witness.

Sometime between November, 1928, and April, 1929, the secretary-treasurer of the defendant corporation,

with the assistance of Myers, prepared a statement of the value of the company's property, which was delivered to at least one prospective purchaser of stock in the corporation. This covered the estimated value and the actual cost of the first fourteen miles of the line, which then extended five miles beyond Alder Creek, and the estimated cost of extending the line an additional four miles. The statement, so far as material here, is as follows:

"Completed line, 14 miles
Estimated value completed line, $16,800.00
Actual cost, $9,900.00
Preferred stock outstanding, $9,900.00
Actual cost of secondary lines, $1,500.00
Customers to date, 22
Average monthly bill per customer, $3.00
Potential customers, 300
Percentage of rate from 22 customers on present investment, gross 8½%

"The above refers to the existing line as now finished so far as preliminary construction is concerned. The ground is hardly scratched yet as to development of business on this line. Four miles more of construction takes the line to the line of the government reserve. Cost of this last four miles as estimated will be:

| | |
|---|---:|
| 86 poles | $ 344.00 |
| 86 holes | 170.50 |
| 21 guy poles | 38.40 |
| Painting, raising and tamping | 186.00 |
| Four miles copper wire | 1,267.20 |
| 172 insulator pins | 55.04 |
| 172 insulators | 49.88 |
| 86 cross arms with hardware | 86.00 |
| Labor, clearing right of way | 100.00 |
| Labor, stringing and tieing 4 miles of wire | 120.00 |
| Total | $2,352.02" |
| | [$2,417.02] |

At the time the proposition of Myers was made to and accepted by the corporation the value of the tangible property was not segregated from that of contracts, accounts and legal services making up the total offer, and apparently no attempt was made to itemize. There was no showing as to what service the personal attorney of Mr. Myers rendered the corporation many months before it was organized or even in contemplation. Neither was any statement made as to what his services in the future would be, nor the estimated value thereof. There appears no justifiable reason for contracting for legal services seventeen months in advance, or for Myers to include in his offer such services. Just what this attorney was to receive from Myers was not, so far as the record discloses, made known to the other directors.

In arriving at the value of the property transferred by Myers to the corporation we can not consider the value of the construction done after acquiring the property from Keagy, as the funds for this work were furnished by Shute and in exchange therefor Shute was given stock by the corporation equal to or exceeding in value the money so furnished. The ninety shares of common stock given by Myers to Shute represented a bonus for which the company received nothing.

Before Myers had agreed to purchase the Loop Electric property from Keagy the latter had attempted to dispose of it without finding any one willing to purchase it at any price. Keagy stated that he was willing to sell it for the amount he had advanced, together with interest thereon and the expenses connected with the lawsuit, amounting in all to between $3,300 and $3,400. Although Myers stated that he had purchased

this property from Keagy before offering it to the corporation, nevertheless the evidence is positive that he had not paid Keagy for it and was not to pay him until after the corporation had been organized, and then only by the transfer to Keagy of a certain amount of stock therein. The evidence does not indicate that Myers made known to the other directors that he was paying for this property with a small part of the stock issued by the company to himself. In effect, Myers had little more than an option on the property which he transferred to the corporation, and it is doubtful that he would ever have paid for the property, had his offer to the corporation not been accepted.

There is little evidence upon which to base the value to the corporation of the attorney's services included in the offer made by Myers. We do, however, have the claim of this same attorney for services rendered by him as secretary-treasurer and attorney for the year 1930 and the first three months of 1931. This claim is based on compensation at the rate of $150 per month.

The value of the property, tangible and intangible, conveyed by Myers to the corporation, together with the value of his attorney's services did not exceed at the utmost $13,000 at the time the offer was accepted. In arriving at this amount we have computed compensation to the attorney at the rate of $150 per month for twenty months, as the articles of incorporation were not filed until May of the year 1928. By including allowance for the attorney's fees in this computation we do not put the stamp of approval upon this manner of doing business, for the matter of compensation for attorneys' services, as for other services, should be presented to and passed upon by the board of

directors in an open and businesslike manner, and the payment for such services should be made to the attorney and not to some one else.

In computing the value of the property we have had in mind its actual value as distinguished from what Myers paid for it: *Grant v. East & West R. Co.,* 54 Fed. 569; *Dickerman v. Northern Trust Company,* 80 Fed. 450; *Clinton Mining & Mineral Company v. Jamison,* 256 Fed. 577. Yet there is respectable authority to the effect that, since Myers did not own the property but was paying for it with the stock of the corporation, the profits attempted to be made by him should inure to the benefit of the corporation.

1. The by-laws of the corporation provided for seven directors, and at the time the offer of Myers was made to and accepted by the corporation only four directors had been elected. Three of these directors were vitally interested in the transaction, to wit: Myers, who was to receive $40,000 worth of the capital stock of the company; Shute, who was to receive ninety shares of the common stock as a bonus; and the secretary-treasurer of the corporation, who was to receive fifty shares of common stock. Section 25-218, Oregon Code 1930, provides among other things:

"that any corporation formed under the laws of this state may purchase real or personal property, including the stock of any other corporation, and issue stock to the amount of the value thereof in payment therefor, and the stock so issued shall be fully paid stock and not liable to any assessment; and in the absence of actual fraud in the transaction, the judgment of the directors as to the value of property purchased shall be conclusive".

This provision of the statute, however, is not controlling when the property is transferred to the corporation at a gross over-valuation: *Atwell v. Schmitt,*

111 Or. 96 (225 P. 325); *Smith v. Schmitt,* 112 Or. 687 (231 P. 176). In the case of *Laing v. Hutton,* 138 Or. 307 (6 P. (2d) 884), this court in referring to the case of *Atwell v. Schmitt,* supra, said:

. "It was further held that the directors' judgment on the value of the property or stock taken by the corporation in payment for its own stock, which section 5872, Or. L. (§ 25-218, Oregon Code 1930), makes conclusive in the absence of fraud, must result from an honest attempt of the directors, acting not for their individual interest but only for [the] corporation, to fix the true valuation, anything less being dishonest and fraudulent".

In dealing with the corporation Mr. Myers was, without question, a promoter, and undoubtedly dictated the selection of the members of the board of directors. A corporation acts only through its board of directors and when the offer made by a promoter who is also a director is not acted upon by an independent board but by a board of which the members are all or practically all financially interested in having the offer accepted, it can not be said that the directors constituting the board have acted in the utmost good faith for the benefit of the corporation. When this court finds a situation such as in the present case, it is not concluded by the statute above referred to, from going into the question of the value of the property conveyed to the corporation.

■ ■ It is, however, maintained by the defendant corporation that since the directors at the time of the transaction owned all of the stock in the corporation and their acts were later approved by the stockholders, subsequent purchasers of stock could not question the *bona fides* of the transaction or the value of the property transferred to the corporation. In support of this contention the case of *Old Dominion Copper Co. v.*

*Lewisohn,* 210 U. S. 212 (28 S. Ct. 634, 52 L. Ed. 1025), and others along the same line are cited and relied upon by defendant. These cases have reference to actions brought in the name of the corporation and not by stockholders. At the same time that the offer of Myers was accepted the directors of the corporation authorized an application to the corporation commissioner for permission to sell $10,000 of the preferred stock, which clearly indicated that at the time the offer was made Myers and his board of directors contemplated selling stock to the public. In the case of *Wills v. Nehalem Coal Co.,* 52 Or. 70 (96 P. 528), this court after stating that "the promoter of a company, like its directors, is deemed to sustain toward the members of the company the relation of a trustee toward his *cestui que trust,"* said:

"This confidential relationship extends not only to present stockholders, but to persons whom they invite or solicit to subscribe for or purchase shares in the company, and their intentional omission to disclose facts to intending subscribers is as much fraud as a positive misrepresentation: 14 Am. & Eng. Ency. Law (2d Ed.) 78".

In a strong dissenting opinion in the case of *Henderson v. Plymouth Oil Company,* 16 Del. Ch. 347 (141 Atl. 197), Judge Harrington said:

"By reason of that fact, and because of the fiduciary relation existing between them, it may be stated as a general rule that promoters of a corporation have no right to retain any profits in any transactions with such corporation unless all persons who have subscribed for, and then own stock in it, have full knowledge of the facts and have either expressly or impliedly consented to the retention of such profits. Old Dom. Copper Co. v. Bigelow, 203 Mass. 159, 89 N. E. 193, 40 L. R. A. (N. S.) 314; Old Dom. Copper Co. v. Lewisohn, 210 U. S. 206, 28 S. Ct. 634, 52 L. Ed. 1025; Davis v. Las Ovas Co., 227 U. S. 80, 33 S. Ct. 197,

57 L. Ed. 426; Id., 35 App. D. C. 372. It may be further stated as a general rule that where undisclosed profits are retained, a court of equity will grant the appropriate relief in a bill filed by the corporation against the promoters who retained such profits. Old Dom. Copper Co. v. Bigelow and Old Dom. Copper Co. v. Lewisohn, and Davis v. Las Ovas Co., supra.

"The same rule would also be applied even if the promotion group were then the only persons who owned stock and were, therefore, the only persons then interested in the corporation, if a further issue and sale to the public was then authorized and intended, and stock was issued and sold pursuant to that intent. Ehrich on Promoters, § 124; Old Dom. Copper Co. v. Bigelow, 203 Mass. 159, 89 N. E. 193, 40 L. R. A. (N. S.) 314; Bigelow v. Old Dom. Copper Co., 74 N. J. Eq. 457, 71 A. 153; In re Leeds and Hanley Theaters, [1902] 2 Ch. D. 809; Luganos Nitrate Co. v. Luganos Syndicate, [1899] 2 Ch. D. 392; Gluckstein v. Barnes, [1900] App. Cas. 240; In re Seamless Paper Box Co., L. R. Ch. D. 467; Plaquemines Trop. Fruit Co. v. Buck, 52 N. J. Eq. 219, 27 A. 1094; Pietsch v. Milbrath, 123 Wis. 647, 101 N. W. 388; 102 N. W. 342, 68 L. R. A 945, 107 Am. St. Rep. 1017".

The Chancery Court of New Jersey in the case of *Allenhurst Park Estates, Inc., v. Smith,* 101 N. J. Eq. 581 (138 Atl. 709), said:

"The prevailing rule applicable to promoters' profits under the circumstances of the instant case is succinctly stated in 14 Corpus Juris, p. 293, § 343, as follows:

" 'If promoters, contemplating a future issue or sale of stock by the corporation, sell property to the corporation at a gross over-valuation, or otherwise receive a secret profit from the corporation, and stock is subsequently issued to innocent purchasers or subscribers as contemplated, the corporation itself, or such innocent purchasers or subscribers on its behalf, when they cannot obtain relief through the corporation, may sue to recover such secret profits, or in a proper case

to set the transaction aside and for other incidental relief; and it is no defense to such a suit that the promoters at the time of the transaction were the only stockholders, and that the corporation technically consented with full knowledge of all the facts' ''.

The Supreme Court of Massachusetts in the case of *Old Dominion Copper Company v. Bigelow,* 203 Mass. 159 (89 N. E. 193, 40 L. R. A. (N. S.) 314), in referring to conditions similar to those in the case at bar, said:

"The situation is akin to the conveyance of property by a man solvent but in contemplation of insolvency. Such conveyance is not wrong until the contemplated indebtedness is incurred which makes him an insolvent. Then the executed evil intent stretches back and invalidates the original conveyance. Here the conveyance to the corporation with the secret profit, when there are no uninformed subscribers to stock, if nothing more is ever done, is not an actionable tort. But the vicious intent looks forward to the procurement of money from the ignorant public by means of original subscriptions and the execution of this evil intent extends backward to contaminate the sale and its profit".

None of the purchasers of preferred stock direct from the corporation knew, so far as the record discloses, the facts concerning the dealings between Myers and the corporation. Mr. Shute acted on behalf of the corporation in disposing of the preferred stock. In regard to this matter he testified as follows:

"Q. And I will ask you this question: If in a sale of any of that stock, either through yourself or through any of the people that you may have had assisting you, did you ever notify these purchasers of preferred stock that there were 380 shares of outstanding common stock in the name of Mr. Myers, or subscribed for by Mr. Myers, for which the only compensation you had was this property?

"A. No, I never discussed that; no, sir".

On cross-examination he gave the following testimony:

"Q. Now, Mr. Shute, at the time you sold this stock to these men, Cleveland and Rugger, and Spencer and Thorne, and all of those men out there, you say you didn't tell them anything about this transaction, about the value of the common stock or the value of the property or anything about it?

"A. I didn't discuss that at all, because the company was going very well, going in, potentially making money and had an opportunity of making money and would get along in very nice shape.

"Q. Did you promise them anything in the way of dividends out of anything except earnings?

"A. I told them there was sufficient earnings there to pay the dividends, and which there were.

"Q. Was that a fact?

"A. It was a fact.

"Q. Is that a fact today, to your knowledge?

"A. It is, unless it is robbed as it is being robbed".

The preferred stockholders who testified stated that they were not told the amount of stock which was issued for the property acquired by the corporation.

The articles of incorporation provide that a dividend at the rate of seven per cent per annum shall be paid on the preferred stock on the first day of January and July of each and every year; that it shall be cumulative and shall have preference over the rights of common stock; that after the payment of seven per cent on the preferred stock seven per cent shall be paid on the common stock, and seven cents on every dollar paid on the purchase price of the stock of no par value; that thereafter out of the net earnings there shall be set aside a sum equal to twenty-five per cent of the net profits, which shall be used and designated as a reserve fund for the purpose of retiring the preferred stock; and that after the foregoing requirements have been met the balance of the net earnings not required

in operation of the corporation shall be distributed to holders of all classes of stock. In event of the failure of the directors to declare and pay the full dividend on preferred stock for three consecutive years, the holders thereof are given the same right to vote that owners of the common stock have, until all preferred stock dividends and arrears are paid in full.

The holders of preferred stock are therefore vitally interested in the question of whether or not the corporation has received value for all of its outstanding stock. When it is shown that stock has been issued by the corporation for property at a gross over-valuation, then it becomes a matter of real concern to the preferred stockholders who have paid full value for their stock.

We shall next consider the question of salaries or compensation of some of the officers of the defendant corporation. As already pointed out, at the meeting of April 16, 1931, it was announced by the chairman that the resolution fixing the compensation for past services of the retiring secretary-treasurer at $2,250 had been passed and that the resolution fixing the salary of the incoming secretary-treasurer at $150 per month had also been passed. It was further announced that the resolution allowing Myers $150 per month for the year ending May 31, 1929, and $250 per month thereafter had likewise been adopted. At the trial it was admitted by counsel for the defendant that the resolution fixing compensation to be paid Myers had not been legally adopted, as there were only four members of the board of directors present and only two of them, including Mr. Myers, had voted for the resolution, but counsel did not state that Myers would not in the future make claim for compensation at the rate and for the period provided in the resolution presented

at said meeting. The resolution fixing the salary of the incoming secretary-treasurer received only two votes, one of the directors voting against it and the other refusing to vote. The resolution providing for the salary of the retiring secretary-treasurer received the votes of all four directors present, including his own.

In the case of *Enders v. Northwestern Trust Company,* 125 Or. 673 (268 P. 49), this court held, citing numerous Oregon precedents, that an officer or director of a corporation "may recover the reasonable value of extraordinary services if rendered under such circumstances as to imply an obligation to pay for them". Section 25-215, Oregon Code 1930, provides in part that:

"The powers vested in the directors may be exercised by a majority of them, and any less number may constitute a quorum at all regular or stated meetings authorized by the by-laws of the corporation in all cases when either of the directors or incorporators shall have filed with the corporation commissioner and county clerk a written statement, designating such less number sufficient to form a quorum".

In the case at bar no written statement was shown to have been filed providing for a quorum of less than a majority of the directors, nor do the by-laws of the corporation provide that a less number than a majority may constitute a quorum.

In the case of *Burton v. Lithic Manufacturing Co.,* 73 Or. 605 (144 P. 1149), this court had before it the question of the number of directors necessary to constitute a quorum. The by-laws of the defendant corporation provided for five directors and stated that a majority of the directors should constitute a quorum at all board meetings. Two of the directors had resigned and their vacancies had not been filled. A resolution

was presented increasing the salary of the president, who was also one of the directors, and it received three votes, including that of the director-president. The court held that the by-laws of the company were in conformity with the statute above quoted and that regardless of the vacancies it was necessary for three directors to be present to constitute a quorum. It further held that since one of the directors was personally interested in the resolution increasing his salary as president, his presence could not be considered in forming a quorum. Many authorities are cited and quoted in support of the foregoing proposition. We quote from the opinion the following:

"The general proposition is laid down in 10 Cyc., page 778, as follows:

" 'It seems that, if there be unfilled vacancies in the board, the quorum is a majority of the entire board, as it would be constituted if all the vacancies were filled, and not a majority of the board as it remains with the vacancies unfilled'.

"On page 777 of the same work, it is stated:

" 'If one director, whose presence is necessary to constitute the quorum, or whose vote is necessary to constitute a majority of the quorum upon a given resolution, is disqualified by reason of his personal interest therein, then the act done is invalid' ".

█ █ Therefore, the resolution providing compensation for past services of the retiring secretary-treasurer and salary for the incoming secretary-treasurer as well as that of Mr. Myers, were not legally adopted, and since no valid resolution providing for such compensation has been adopted, the defendant corporation is without authority to pay the same.

"It is entirely settled that, where directors of a corporation attempt to deal with themselves, their acts are the subject of judicial inquiry and supervision. Directors cannot fix the value of their own services to

the corporation. Whenever they attempt to do so, and their action is challenged by a stockholder or other interested persons, the burden is upon them to show what they have done to merit payment; and the quantity of compensation to which they are entitled is to be graded, not by the sum voted, but by what they earn: Gardner v. Butler, 30 N. J. Eq. 702-725; Fougeray v. Cord, 50 N. J. Eq. 185, 24 Atl. 499''. Davis v. Thomas & Davis Co., 63 N. J. Eq. 572 (52 Atl. 717).

These officers, however, have a valid claim against the corporation for the reasonable value of any extraordinary services rendered the corporation under such circumstances as would imply an obligation to pay for them: *Enders v. Northwestern Trust Company* and *Burton v. Lithic Manufacturing Co.,* supra; *Baines v. Coos Bay Navigation Co.,* 41 Or. 135 (68 P. 397). As the evidence in this case is insufficient to indicate the nature and extent of such services, we are unable to determine the value thereof as was done in *Burton v. Lithic Manufacturing Co.,* supra.

Prior to the amendment of § 1108, Or. L. (now § 32-702, Oregon Code 1930), the appointment of a receiver was an ancillary remedy and in aid of the primary object of the litigation between the parties. That section then expressly provided that a receiver might be appointed in any civil action, suit or proceeding other than an action for the recovery of specific personal property. In the case of *Cook v. Leona Mills Co.,* 106 Or. 520 (212 P. 785), this court called attention to the difference between the above provision and a statute of the state of Washington, in the following language:

"On the other hand, the code of the state of Washington makes no reference to the necessity of an 'action pending', but provides that:

" 'A receiver may be appointed by the court in the following cases: * * *

" '(5) When a corporation is insolvent or in imminent danger of insolvency. * * *' Section 741. * * *

"We have previously referred to the language of the Washington statute. In Biehn v. Aetna Investment Co., 110 Wash. 460, 188 Pac. 489, the Supreme Court of Washington said:

" 'This court has, in an unbroken line of decisions, upheld the appointment of receivers for insolvent corporations: Oleson v. Bank of Tacoma, 15 Wash. 148, 45 Pac. 734; New York National Exchange Bank v. Metrop. Sav. Bank, 28 Wash. 553, 68 Pac. 905; Davis v. Edwards, 41 Wash. 480, 84 Pac. 22; Blum v. Rowe, 98 Wash. 683, 168 Pac. 781, L. R. A. 1918C, 630'.

"But note the Washington statute hereinbefore referred to".

After the above decision was rendered the legislature of this state amended § 1108, Or. L., to conform to the statute of the state of Washington relating to receiverships, so that in its present form as § 32-702, Oregon Code 1930, it now provides that:

"A receiver may be appointed by the court in the following cases: * * *

"(8) When a corporation or cooperative association has been dissolved or is insolvent or in imminent danger of insolvency and it is necessary to protect the property of the corporation, or cooperative association, or to conserve or protect the interests of the stockholders or creditors".

■ Under circumstances such as shown in the case at bar the court has jurisdiction to appoint a receiver. That the corporation is in imminent danger of insolvency is apparent from the testimony in this case. Evidence was introduced showing the number of customers from January 1, 1930, to February 1, 1931, and during that period there was an average of one hundred thirty customers who were paying on an average $3 each per month, furnishing an average monthly income of $390 to the corporation. During the same

period there was an attempt on behalf of those in control of a majority of the common stock of the corporation to authorize the payment of $250 per month to Myers and $150 per month to the secretary-treasurer in salaries. The electric power purchased cost on an average approximately twenty-five per cent of the monthly revenue received by the company from customers. The foregoing expense items do not take into account depreciation, taxes and licenses, repairs and other necessary expenses connected with the operation of the corporation.

As already pointed out, no dividends have ever been declared by the directors of the corporation, but there has been paid out of capital stock, money paid in by customers for the extension of service to their premises, the sum of $1,651.68, designated "payments in lieu of dividends" as above noted. There has also been paid to Myers and to grocery stores on his account the sum of $3,115.67, without, so far as the record shows, the approval of the board.

A statement of assets and liabilities of the corporation as of August 31, 1931, was compiled as follows:

"ASSETS

| | | |
|---|---|---|
| Cash | $ 102.07 | |
| Accounts receivable | 2,208.86 | |
| Equipment | 65,448.10 | |
| Coms.—deferred | 920.00 | |
| | | $68,679.03 |

LIABILITIES

| | | |
|---|---|---|
| Accounts payable | $ 3,831.98 | |
| Notes payable | 1,000.00 | |
| Capital stock—Common | 39,000.00 | |
| Capital stock—Preferred | 17,100.00 | |
| Surplus—Cap. $8,436.04 | | |
| Surplus—Oper. 688.99 | 7,747.05 | |
| | | $68,679.03" |

These accounts payable, however, did not include the claim of Myers for salary, which at that time, according to his assertion, was in excess of $8,000. The "equipment" carried on the books at $65,448.10 included the $40,000 value assigned to the original Loop Electric property which has been exchanged by Myers at a gross over-valuation for stock in the corporation. If a revised statement were prepared showing the real value of the equipment as herein pointed out, and the liability of the company to Myers for compensation, if any, it is apparent that the liabilities of the company would exceed its assets by at least $27,000.

The funds derived from the sale of preferred stock, the money furnished by Shute and the payments by customers on extension contracts constituted the greater part of the money which has been spent in improving and extending the system. Revenues derived from the operations of the defendant company have been insufficient to pay current expenses and the claim of officers for salaries. If these salaries were allowed, as attempted to be approved by the board of directors, the revenues of the company for the first three years of its operation would be approximately $7,000 short of meeting expenses.

The manner in which common stock in the corporation was acquired and the conduct of the affairs of the corporation, including the use of the customers' account to pay preferred stockholders in order either to prevent them from voting at the stockholders' meeting or to create an impression that the company was making a profit, indicate at least poor management and a total disregard of the rights of preferred stockholders, and if permitted to continue would inevitably bring about insolvency of the corporation.

The defendant is a public service corporation and as such is limited in the charges which it can impose upon the consuming public. Consequently it is limited in the profits which it is entitled to make. The proper valuation of its equipment for rate-making purposes would undoubtedly reduce materially the book-value at which it is carried in the company's records. Moreover, the customers who have assisted in the construction of the system by contributing in excess of $8,000 have an interest in seeing that the company functions regularly and that they receive adequate and permanent service at reasonable rates.

■■ The appointment of a receiver to liquidate and wind up the affairs of a corporation is a harsh remedy and ought not to be invoked except in extreme cases and then only as a last resort. A court of equity has jurisdiction to appoint a receiver for solvent corporations at the instance of stockholders, on the ground of fraud and mismanagement: 43 A. L. R. 246 and authorities there cited; *Baillie v. Gold Min. Co.,* 86 Or. 1 (166 P. 965, 167 P. 1167).

''Cases are to be found which assert that courts of equity, by virtue of their general equitable jurisdiction, will not appoint a receiver of a corporation, and assume control and management of its affairs, at the suit of a stockholder alleging fraud, mismanagement, and collusion on the part of the corporate authorities, or *ultra vires* acts of the directors or of the corporation itself. The denial of the power to grant relief in such cases is based on one or both of two grounds: First, that such relief, in effect, results in a dissolution of the corporation, and the court should refuse to accomplish indirectly that which it has no power to do directly; second, that an injunction, addressed to the specific wrongs charged, affords a sufficient remedy. But, notwithstanding many *dicta,* and the assertions of the older text-books, the current of recent authority ap-

pears to be strongly in favor of the inherent power of the court, in a proper case, to displace the management of guilty or negligent officials by the instrumentality of its receiver. It has been frequently pointed out that the appointment of a receiver in cases of this character does not necessarily result in the dissolution or extinction of the corporation. 'The property and assets of the corporation, which are being dissipated and fraudulently absorbed, will be preserved and rightfully applied under the supervision of the court, and may be restored to the officers of the corporation, when there has been a change of officers, or when it is deemed prudent and safe to restore the property and affairs of the corporation to its duly constituted officers'.'' Pomeroy's Eq. Jur. (4th Ed.), volume 4, § 1541. See also cases cited in the footnotes.

■ It is not necessary, in the event that a receiver is appointed, that the corporation be liquidated. In a case of this kind we believe it advisable, if it be found necessary to appoint a receiver for the company, that an attempt be made through such receiver to preserve the assets of the corporation and turn the management thereof back to the stockholders after the affairs of the company have been properly adjusted.

The decree of the lower court must be reversed and the cause remanded for further proceedings in accord with this opinion. The interested parties may be able within thirty days or such further time as the court may allow, after the entry of the mandate herein, to agree upon and submit to the circuit court for its approval the amount of compensation to which Myers and the former and present secretary-treasurers are entitled. If such an agreement cannot be reached, or is not approved by the court, the complaint may be amended to include as parties defendants the employes who are asserting claims for compensation against the

corporation, and by appropriate allegations have the matter determined by the court. It may also be possible by following a similar procedure to determine and dispose of the payment for stock or cancelation of certificates of so much of the stock as was issued in excess of the value of the property acquired in exchange therefor by the corporation, and to effect such other relief as may be equitable and just to all parties concerned.

What we have said in regard to the procedure in the lower court is merely advisory, as that court is in much better position than this court to determine the method to be pursued in working out the rights of the parties as herein defined.

RAND, C. J., BEAN and CAMPBELL, JJ., concur.

---

Petition for rehearing denied May 16, 1933

## ON PETITION FOR REHEARING
### (21 P. (2d) 1100)

BAILEY, J. In a petition for rehearing, the respondent, Mt. Hood Electric Company, makes the following statement:

"The court erred in finding that a revised statement of the corporation would show that the liabilities would exceed the assets by at least $27,000, the court having failed to consider that the stock liability would be reduced or paid up, under this decree, to exactly the same amount as it is determined that the value of the property of the company should be reduced, that the salary liability can not be set up until the amount is fixed in the manner provided in this opinion.

"In support of our contention that a revised statement of the company's affairs, if we give effect to the court's ruling, we submit the following statement show-

ing a financial statement of the company as it would appear as of August 31, 1931, after giving effect to a revaluation of the property, the cancelation of a corresponding amount of common stock, the cancelation of the salaries, and the increase of the operating surplus in a corresponding amount, namely:

## "Financial Statement

Assets

| | | |
|---|---|---:|
| Cash | | $ 102.07 |
| Accounts receivable | | 2,208.86 |
| Equipment | | 40,448.10 |
| Coms.—deferred | | 920.00 |
| | | $43,679.03 |

Liabilities

| | | |
|---|---:|---:|
| Accounts payable | | $ 906.98 |
| Notes payable | | 1,000.00 |
| Capital stock—Common | | 14,000.00 |
| Capital stock—Preferred | | 17,100.00 |
| Surplus—Capital | $8,436.04 | |
| Surplus—Oper. | 2,236.01 | 10,672.05 |
| | | $43,679.03 |

"If, however, the stock in excess of the value of $13,000 should be paid in, the cash would be increased by $25,000, the equipment decreased by $25,000, and the stock liability would remain the same".

■ Mr. Myers, as pointed out in the former opinion, had subscribed for 380 shares of the common stock at $100 per share, and 20 shares of stock of no par value, which latter shares were determined to be of equal value to the preferred stock, or $100 per share, making in all $40,000 worth of stock subscribed by him. In our former opinion we held that the total value of the property transferred by Myers to the corporation, together with services of his attorney, did not exceed $13,000, thus leaving a difference of $27,000.

The foregoing quoted statement of the value of the equipment is based upon a reduction of $25,000, apparently on the assumption of respondent, as appears elsewhere in its brief, that the total value paid to Mr. Myers was $38,000, which was the face value of the common stock received by him but did not include any valuation for the stock of no par value. We were, due to lack of testimony, unable to determine the value of the equipment, but it was definitely decided that $40,000 worth of the stock was exchanged for property and services not worth in excess of $13,000.

In the event the respondent and its officers who are interested in receiving compensation for past services, should see fit, as intimated in the foregoing quotation, to cancel any obligation for past salaries for services, and if, in addition, the excess stock should be returned to the corporation, the necessity for the appointment of a receiver would in all probability be eliminated. In order that the need of a receiver might be obviated, we suggested in our former opinion that the amount of compensation, if any, to the officers of the corporation, might be determined in the subsequent proceedings in the circuit court, and that the question of return of the stock might be disposed of in like manner.

If the complaint be not amended so that these issues can be determined, the officers and directors who are affected by the salary question and the suggested return of excess stock may appear, by way of intervention or otherwise, and have such matters determined. If this is done, the final determination of these matters may obviate the necessity for the appointment of a receiver. If it is not done, it will be necessary to appoint a receiver to bring suit for the cancelation of the

certificates for the excess stock issued and a determination of the other matters referred to in our former opinion.

The pleadings before us asked for the appointment of a receiver and for an injunction against the payment of certain salaries and compensation to named officers. In order to decide those questions it was necessary to determine the value of the property received by the corporation from Mr. Myers, the validity of the claims for past services, and the legal effect of the purported resolutions of the board of directors regarding such claims.

The officers and directors in charge of the corporation forced the preferred stockholders to pursue this course. The same officers and directors appeared personally in the circuit court, directed the defense of the corporation and testified on its behalf. The petition for rehearing seems to give more importance to their rights than to the good of the corporation.

■ We desire to emphasize what was said in our former opinion to the effect that a receiver should not be appointed if the affairs of the corporation can be adjusted otherwise.

All other questions raised by the petition for rehearing were duly considered in the preparation of our former opinion.

The petition for a rehearing is denied.

BEAN and CAMPBELL, JJ., concur; RAND, C. J., not participating.