**HAYES v. KELLEY et ux.**

No. 9352.

Circuit Court of Appeals, Ninth Circuit.

June 13, 1940.

Rehearing Denied Aug. 21, 1940.

HANEY, Circuit Judge, dissenting.

Galloway & Krier, of The Dalles, Or., and Irving Rand, of Portland, Or., for appellant.

Harris & Bryson, Lawrence T. Harris, and David B. Evans, all of Eugene, Or., for appellees.

Before GARRECHT, HANEY, and HEALY, Circuit Judges.

HEALY, Circuit Judge.

Appellant sued for an accounting of profits inuring to appellees from the sale of shares of stock in a mining corporation. From an adverse judgment he appeals.

A preliminary question involves the record on which the appeal is to be heard. The printed record contains the findings of fact and an order supplementing and amending the findings, but it does not contain the evidence.

At the conclusion of appellant's case the court granted a motion for a judgment of involuntary nonsuit, and thereafter made findings of fact. Sixteen days after the entry of these, namely, on June 21, 1939, appellees filed a motion to modify and amend the findings in certain particulars. On August 30, 1939, notice of appeal was given. On September 21, 1939, the court, of its own motion, made an order supplementing and amending the findings.

Appellant contends that the course pursued was without authority under Rules 52 and 59 of the federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c. However, he asserts that the recital of the facts as contained in the supplemental order correctly reflects the evidence, and he insists that these recitals confirm his view of the case. At the close of his discussion of the matter he states: "The remainder of the order consists of conclusions which are but a reiteration of the erroneous conclusions reached by the trial court and announced when appellant rested his case. The facts are all admitted, or found and determined. The erroneous conclusions of the trial court as to the law applicable to the admitted and determined facts form the basis and reason for this appeal."

Since the parties are agreed that the original and so-called supplemental findings correctly reflect the facts, while disagreeing as to the legal conclusions properly to be drawn from them, we have felt free to consider the whole of the findings without passing upon the authority of the trial court to amend in the fashion here ex-

emplified. The factual situation so disclosed is as follows:

Appellees are husband and wife. For convenience they will be referred to as Kelley, and appellant as Hayes.

In 1934 the Horseheaven Mines company was incorporated under the Oregon laws. It had an authorized capital of 75,000 shares of the par value of one dollar each. Kelley owned 24,000 shares and Hayes 15,750 shares. The most substantial asset of the corporation was a cinnabar property located in Jefferson County, Oregon. From the time of the organization of the company until June 11, 1935, Hayes was in active management of the operations at the mine and was also a director of the corporation. Kelley was and continued to be a director.

Prior to June, 1935 the company was not in good shape financially, and its holdings, or rather the shares of its stockholders, appear to have been for sale. In February of that year Hayes wrote Kelley that there was a possible chance of disposing of the mine for $100,000, and inquiring whether Kelley would accept a pro rata of that sum for his interest. At that time Kelley transmitted to Hayes, for such use as the latter might make of it, a thirty-day option on his stock in favor of a man named Wilson. This option, which was renewed for an additional thirty days at Hayes' request, provided for an aggregate price of $100,000 for all the outstanding stock of the company. The option was not exercised.

At a meeting of the directors on June 11, 1935, Hayes was discharged as manager and was replaced by one Whiting. At the stockholders' meeting which preceded it Hayes had been re-elected as a director but he failed to qualify, and thereafter did not participate in the business or affairs of the company. Upon his displacement as manager "he walked out of the board meeting without saying whether he would or would not come back and he did not return to the meeting." The corporate by-laws provided that any duly elected and qualified director should continue in office as such until a successor be elected and qualified. Between June 11 and July 7 Hayes made two trips to the mine but did not enter the workings, and on the latter date he moved his personal effects from the mine to Curry County, Oregon, where he has since resided.

The Sun Oil Company, a large and financially able corporation, was interested in the acquisition of mercury mines. On the 9th of July, 1935, Samuel Williston, repre-senting that concern, visited the mine with one John Silvertooth, a broker whose services appear to have been earlier enlisted by Hayes. Williston went through the workings and discussed with Whiting, the then manager, the possibility of purchasing the mine. Whiting informed him that some of the stockholders were or had been asking $125,000 for the property. This visit was at once reported by Whiting to the Eugene office of the company. On July 30 Whiting reported by letter to the Eugene office that a round shot out in the winze had developed a new ore body running from 14 to 17 pounds of mercury per ton. On August 15 Williston, with a cook and a field man, went to the mine and commenced an examination of it, remaining there for about ten days in the interest of the Sun Oil Company. During this visit there was no discussion concerning price or terms of purchase.

The monthly record of production of the mine from April 1, 1935, to September 30 following shows a fairly constant output in tons. During the first four months of this period the ore yielded an average somewhat in excess of 6 pounds of mercury per ton. In August the yield was 8.4 pounds per ton, and in September 13.5 pounds. There was informed testimony that a yield of around 6 to 6½ pounds per ton meant that the mine was about breaking even, whereas a yield of 8.4 pounds "meant making a little money." Hayes testified that high-grade ore "means anything from six pounds on up."

Between August 25 and November 27, 1935, Williston made four trips to the mine. During the first part of October he met with Whiting and one Betts, a stockholder, at a hotel in Portland, at which meeting a possible sale was further discussed. On November 27 Williston met with certain of the stockholders, not including Kelley. After November the negotiations continued intermittently until March, 1936, at which time a written option to purchase all of the stock of the corporation for $200,000 was prepared, the option being signed by all the stockholders on April 1, 1936. The option was exercised by the Sun Oil Company in August of that year, and the purchase price was thereafter paid in instalments.

Between about June 15 and August 1, 1935, Kelley was on duty at Vancouver Barracks, Washington. He knew of the presence of Williston at the property during August. Either on the 18th or on the 25th of that month he personally visited

the mine and made inquiries of Whiting concerning it and concerning Williston's visit.

On August 14, 1935, Hayes wrote Kelley as follows: "I have decided to dispose of my interest in Horse Heaven. Since my interest together with yours would give you control, I thought possibly you would be interested. My address is Box 5, Sixes, Oregon."

On August 16 Kelley, through a clerical employee of the corporation, caused a reply to be made as follows: "Mr. Kelley has asked me to reply to your letter of August 14th, regarding your decision to dispose of your interest in Horseheaven. If the price does not exceed $5,000, Mr. Kelley might be interested in buying your share. If this is satisfactory, Mr. Kelley would appreciate hearing from you at your convenience."

On August 18, Hayes wrote: "I had decided to offer my interest in Horse Heaven for $10,000. However, I would consider $7,500 provided the deal can be consummated in the next few days. I would be willing to take $5000 cash and your notes distributed over a period of two years for the balance. I would appreciate an early reply one way or the other."

August 20 Kelley replied: "This acknowledges receipt of your letter of August 18. There has been no change in conditions such as to alter the first offer I made you. I am sorry that the offer cannot be raised above the price quoted to you in my last letter."

August 22 Hayes wrote Kelley: "Received your letter of August 20. I am reluctant to take $5000 for my interest in Horse Heaven. However I have a deal pending here and need to use the money. If this deal can be closed not later than Monday the 26th I will take $5000 cash. My option on the deal down here expires on that date. I will endorse my stock and leave at the First National Bank at Bandon, instructing them to mail it to you upon receipt of the money. I hope that the above meets with your approval as I am only suggesting this arrangement in order to save time."

On August 27 Kelley wrote Hayes that the latter's communication of August 22 had been received while Kelley was out of the city. Kelley went on to say "in your letter you state that you were willing to close the deal not later than Monday, the 26th. I was unable to handle the transaction at that time and am still unwilling to pay $5000 cash for this stock." Instead, the letter stated, Kelley would pay $3,000 in cash and give notes for the $2,000 balance. He added that he had sent to a Bandon bank the requisite check and notes, and if Hayes desired to close the transaction on that basis, he should leave his stock with the bank, which would be authorized to turn over the check and notes. "I have told the bank not to hold this matter more than a few days and if you desire not to close the transaction please advise me by return mail so that I can have the bank return the money and notes to me." Ending his letter, Kelley stated that he was unwilling to make any different deal and would like to have his offer accepted or rejected at once.

Hayes promptly closed with the offer. Ultimately, on the exercise of the Sun Oil Company option taken the following spring, Kelley received a sum in excess of $40,000 for the stock acquired from Hayes.

At the close of appellant's testimony the trial court expressed the opinion that Hayes, interested only in getting out, did not care what the situation was at the mine and made no effort to learn of conditions there before offering his stock for sale; and that as an experienced cinnabar miner he knew more than any one else about the property up to the time he ceased to be manager.

Counsel for Hayes contend that it is the rule in Oregon that in respect of transactions involving the acquisition by a corporate director of the shares of a stockholder the director is a fiduciary; and that because of this relationship Kelley was obliged to disclose to Hayes all material facts known to Kelley as a director bearing on the value of the stock. This, it is claimed, Kelley failed to do; hence he should be required to account to Hayes for the profits realized. Kelley, on the other hand, denies that in Oregon a fiduciary relationship subsists between director and stockholder in respect of transactions of this nature. Each party relies on the same decisions of the Supreme Court of that state as supporting his contention. These cases are Enyart v. Merrick, 148 Or. 321, 34 P.2d 629; Rugger v. Mt. Hood Elec. Co., 143 Or. 193, 20 P.2d 412, 21 P.2d 1100; Wills v. Nehalem Coal Co., 52 Or. 70, 96 P. 528; Davis v. Hofer, 38 Or. 150, 63 P. 56; Baillie v. Columbia Gold Min. Co., 86 Or. 1, 18, 166 P. 965, 167 P. 1167.

■ Elsewhere than in Oregon, the general rule seems to be that a director of a

corporation does not sustain a fiduciary relation to an individual stockholder with respect to his stock, and the mere failure on the part of a director, in acquiring the shares of a stockholder, to disclose inside information, will not militate against him so long as he does not actively mislead the seller or perpetrate a fraud. There is respectable authority to the contrary. The cases dealing with the subject are collected in a note to Voellmeck v. Harding, 166 Wash. 93, 6 P.2d 373, 84 A.L.R. 608.[1]

The local rule is not clearly defined. In Enyart v. Merrick, supra, [148 Or. 321, 34 P.2d 632], the court expressed an unwillingness to extend without limit "the analogy of the directors' and stockholders' relationship to that of trustee and cestui que trustent". In Oregon, as elsewhere, it is to be gathered that much depends on the facts of the particular case. We think from the tenor of the decisions there that, in appraising a transaction involving the purchase of shares, the fact that one party is a corporate director and the other a stockholder is to be taken into account. Transactions between persons standing in that relationship will be closely scrutinized.

But whatever the local rule may be, we doubt its applicability in the situation here presented. Kelley and Hayes were director and shareholder in a technical sense, only. In the same technical sense Hayes himself continued to be a director. The relationship was superficial and has little if any bearing on the disposition to be made of the case. Substantially, the men were fellow stockholders. Neither appears to have reposed any special measure of confidence in the other, and it seems obvious from a reading of their correspondence that the two sought to deal at arm's length.

Had Hayes called upon Kelley for information concerning the current condition at the mine, or if Kelley had volunteered information, or been active in inducing the sale, we think in fairness he would have been obliged to speak fully concerning everything which it might be of material advantage for Hayes to know. Even in the absence of these circumstances, if to Kelley's knowledge there had been overtures to purchase the corporate property or stock at a definite figure, we may assume, without deciding, that he would have been obliged to acquaint Hayes with the fact. But no situation of that sort is presented.

Hayes was an experienced miner. He was better informed than Kelley concerning the possibilities of the property and had equal means of informing himself of current developments. He was the moving party in effecting the sale of his stock, and his desire seems to have been to terminate his connection with the company.

It is not disputed that values in mercury mines are apt to vary at short intervals, and indeed the previous operations of the property in question exemplified this characteristic uncertainty. While Hayes was manager the ores discovered had varied in yield from four to thirty dollars per ton. The court found as a fact, and the finding is not disputed, that there was no indications that the higher grade of ore discovered in late July would persist or that it would affect the value of the stock.

During Hayes' own regime, the mine was a substantial producer and the property was known to be for sale. There was nothing startling in the circumstance that a concern interested in the acquisition of mercury mines should examine it. From the mere fact of inspection it did not follow that the Sun Oil Company would decide to buy. Much less did it follow that a price would be offered which would prove attractive to the shareholders. Viewing the situation as it existed in August, 1935, a favorable disposition of the mine was little more than a possibility, and the worth of appellant's shares remained problematical.

On appeal Hayes stresses the statement in Kelley's letter of August 20 that "there has been no change in conditions such as to alter the first offer I made you". It is said that this was a representation that conditions at the mine remained unchanged; but we agree with the trial court that the statement is not susceptible of that interpretation, and that it could not fairly have been so understood. The court found as a fact that Hayes did not rely upon it as a representation.

Affirmed.

HANEY, Circuit Judge (dissenting).

The sole question presented by appellant is whether or not the trial court made erroneous conclusions of law from the facts found. To determine that question we must determine what facts were found.

Trial of the case was completed on May 25, 1939. Appellees presented their pro-

---

[1] Consult Discussion in 46 Yale Law J. 143.

posed findings of fact and conclusions of law on May 26, 1939. Appellant presented his proposed findings of fact and conclusions of law on May 31, 1939. After deliberation and on June 5, 1939, the court below adopted the findings of fact proposed by appellant, but made different conclusions of law, and judgment was entered on the same day. Sixteen days after entry of judgment and on June 21, 1939, appellees filed a motion to amend the findings. Notice of appeal was filed by appellant on August 31, 1939.

On September 21, 1939, there was entered and filed an "Order Supplementing And Amending The Findings Of Fact". Therein it was recited that notwithstanding Federal Rules of Civil Procedure, Rule 52(b), 28 U.S.C.A. following section 723c, "the court possessed inherent power on its motion and independently of any motion by a litigant to amend the aforesaid heretofore signed Findings so as to make the same adequately and correctly express the opinion and conclusions of the court." Inspection of the record, I think, leads to the conclusion that the amendment of the findings was an afterthought, and was made to attempt to support a decision after an appeal had already been taken. There is no more reason why the findings favorable to appellees should have been made on September 21, 1939, than on June 5, 1939, yet such findings were refused on the earlier date.

Appellant based his entire opening brief on the original findings. The last page of such brief is an "Addendum Note" to that effect, wherein appellant gives as his reason for that action that "the trial court had no jurisdiction to enter" the amended and supplemental findings. Appellees, in their brief, stated that there were four questions for decision, one of which was "Whether the trial court possessed the inherent power to make and file the amended findings." In a reply brief, appellant devotes several pages to the proposition that the amended and supplementary findings cannot be considered. He states: "We conclude therefore that no possible justification exists for any consideration by this court of the so-called amended findings signed by the trial court on September 21, 1939. We so conclude even though this order recites many of the facts in the case, among them: * * * [Certain detailed facts are set out, most of which are contained in the original findings.]"

Following these recitals appears the alleged "concession" quoted in the majority opinion.

It is perfectly clear, I think, that there was no such concession as is asserted by the majority. The statement that the "facts are all admitted, or found and determined" obviously means those contained in the original findings. It is impossible to suppose that appellant would present an opening brief of 45 pages on facts admittedly incomplete, again urge that the amended findings could not be considered in the reply brief, and thereafter destroy all that he had previously said by a "concession". Reason indicates that the statement in the trial brief is not susceptible to the interpretation placed on it by the majority. The question is not whether the evidence supports the judgment, but whether the evidence supports the findings, because we must sustain the findings unless "clearly erroneous". Federal Rules of Civil Procedure, Rule 52 (b). Neither question is suggested by the parties.

Appellees contend that we may consider the amended and supplemental findings because, as the trial court held, such court has inherent power to amend its findings. Such contention is beside the point. The point is whether such power, if it exists, may be exercised without regard to any time limit. I think it may not be so exercised.

First. Federal Rules of Civil Procedure, Rule 52(b) provides in part: "Upon motion of a party made not later than 10 days after entry of judgment the court may amend its findings or make additional findings and may amend the judgment accordingly. * * *"

While the rule obviously refers to action taken on the motion of a party, I believe the time limit, there expressed, applied to action of the court, sua sponte. If not the judgment is a "will-of-the-wisp" act, capable of being changed at any time, and a trial court could effectually prevent any determination of an appeal, by repeated amendments and supplements. Nothing in the rules suggests such frustration of an appeal. Rules and powers with respect to making amended or supplemental findings are similar to and should be considered in the same light as a motion for a new trial. A motion for a new trial must be made within 10 days after entry of judgment, when made by a party, and is subject to the same time limit when granted on the initiative of the court. Rule 59(b) and (d).

Second. Even though we consider that the trial court is not limited as to time for such a motion, I think nevertheless that the court's motion here was too late. Appellees do not contend that their motion prevented the taking of the appeal, for obviously Rule 52(b) negatives any such contention. When appellant appealed, the trial court lost jurisdiction to amend its findings thereafter as was attempted. Our jurisdiction had attached, and the trial court had only such jurisdiction over the cause as is given by the Rules. Jurisdiction to amend the findings after appeal is taken is not conferred by the Rules.

Third. Independently of the foregoing, the so-called amended findings should be closely scrutinized. They consist, principally, of a statement of evidence, and are not findings at all. Testimony is actually quoted in such so-called findings.

The question here is one of extreme importance. The majority's decision fixed a vulnerable precedent, I think, and is likely to breed confusion where certainty is required in a simplified code of practice. For that reason, and believing the majority's decision to be erroneous, I dissent, without expressing any opinion as to the merits.