Robert S. GAYNOR, Plaintiff,

v.

James L. BUCKLEY, Julian N. Cheatham, Charles Daniel, H. Stuart Daniels, Fred A. Ferroggiaro, Harvey C. Fruehauf, Robert F. Johnson, Robert B. Pamplin, Carrol M. Shanks, Samuel H. Swint, John S. Brandis, Plywood Products Corp. and Georgia-Pacific Corporation, Defendants,

Janet Stone, Intervenor.

Civ. No. 60–473.

United States District Court
D. Oregon.

March 23, 1962.

Sidney L. Garwin, New York City, and Nels Peterson, Portland, Or., for plaintiff.

Robert S. Miller and Fredric A. Yerke, Jr., of King, Miller, Anderson, Nash & Yerke, Portland Or., for defendant Georgia-Pacific Corp.

George W. Foley and Robert M. Feely, of Shearman & Sterling, New York City, and by James C. Dezendorf, of Koerner, Young, McColloch & Dezendorf, Portland, Or., for individual defendants.

SOLOMON, Chief Judge.

Plaintiff, a minority stockholder in Georgia-Pacific Corporation (G-P) brought this derivative action on behalf of the corporation against its board of directors and Mr. Jack Brandis, one of its officers.[1] Plaintiff seeks the cancellation of a stock option granted Brandis and an accounting on a joint venture between G-P and a group of corporations controlled by Brandis. This venture culminated in G-P's purchase of the Brandis interests. Plaintiff asserts that the joint venture diverted a G-P corporate opportunity to Brandis and that the price paid for Brandis' corporations was grossly excessive. In the period covered by this action, Brandis was not a director of G-P and none of G-P's directors had a financial interest in Brandis' corporations.

When G-P acquired major timber interests in Oregon in 1954, it needed an experienced logging and timber man in this area. Its attorneys recommended Brandis as the best man in the Pacific Northwest. Brandis was reluctant to join G-P because since 1953 he had been operating his own company, Plywood Products Corporation (Plywood). Plywood utilized "white speck" veneers for the inner plies of plywood sheathing. "White speck" is a term applied to Douglas Fir timber which has been infected by a fungus that impairs the strength and market value of the timber and its products. For this reason, the Douglas Fir Plywood Association (DFPA) does not certify sheathing containing white speck veneers even though the white speck is only used for the inner plies. DFPA certification generally leads to a higher price for sheathing.

In March, 1955, after several months of negotiation, Owen Cheatham, G-P's president, and Robert Pamplin, administrative vice-president, prevailed upon Brandis to join G-P at an annual salary of $25,000 plus a bonus not to exceed that amount. However, they yielded to Brandis' demand that he be allowed to retain his 15 per cent stock interests in Plywood and his interests in two associated companies, Spring Creek Lumber Company and Benton Timber Products Corporation. In June, 1955, Brandis and members of his family purchased all of the remaining stock in Plywood for about $80,000.

Brandis' performance as G-P's chief forester was eminently satisfactory, but G-P's management was concerned over his outside interests. As a matter of policy, management wanted the undivided attention and loyalty of all executive employees. In February, 1956, G-P made Brandis vice-president in charge of timber operations and offered him an option to purchase 10,000 shares of G-P stock at $36.22 per share, which was 95 per

1. Plaintiff Robert S. Gaynor became a G-P stockholder on June 4, 1958, and now owns 70 shares of stock. Plaintiff-intervenor Janet Stone became a G-P stockholder on March 29, 1955, and now owns 200 shares of stock. Plaintiff and plaintiff-intervenor are citizens of New York. Defendants who were served are all citizens of Oregon except for defendant G-P, which is a Georgia corporation doing business in Oregon.

cent of the stock's current market price. Paragraph 15 of the option agreement required Brandis to sell his outside interests and move from Corvallis to Portland, Oregon before December 31, 1958.[2] The directors submitted this option, and two similar options to other officers, to the stockholders for ratification. Neither the notice to the stockholders concerning the annual meeting nor the proxy statement which accompanied it referred to the conditions in paragraph 15.[3] The minutes of the April 25, 1956, stockholders' meeting, at which the stock option agreements were ratified, report that the details of the options were discussed in substantially the same terms as those appearing in the proxy statement.

In July, 1956, G-P purchased the assets of the Coos Bay Lumber Company (Coos Bay) for $70,000,000. These assets included 120,000 acres of timber and timberlands containing substantial quantities of white speck. Coos Bay followed industry practice in logging these lands by either leaving the white speck in the woods or burning it. G-P continued this practice until Brandis completed a detailed survey of the timberlands in August, 1957. He urged management to utilize this white speck timber by manufacturing an ungraded sheathing that contained inner plies of white speck veneer. He conducted G-P sales and production people through his own Plywood Products' plants and offered to make these facilities and personnel available if G-P elected to produce white speck sheathing. By this time, Plywood had become one of the largest producers of white speck sheathing in the Pacific Northwest.

Brandis only convinced Pamplin and Mr. Robert Floweree, head of lumber production for G-P, that G-P should itself enter the white speck field. The sales department opposed white speck on two grounds: (1) it would be difficult to sell sheathing not certified by DFPA; and (2) the sale of uncertified sheathing would depreciate G-P's market for higher grade sheathing. The plywood production department opposed the manufacture of white speck sheathing on the ground that G-P's existing facilities could not process white speck timber successfully.

In the fall of 1957, G-P negotiated with Textron for the purchase of a veneer plant at Norway, Oregon. This

2. "15. Anything herein contained to the contrary notwithstanding:
    "(a) During the period from the date hereof to the date on which the Optionee disposes of the interest which he now owns in Plywood Products Corporation, Corvallis, Oregon (Plywood), Benton Timber Products Corp., Philomath, Oregon (Benton), and Spring Creek Lumber Co., Philomath, Oregon (Spring Creek), he may render minor consulting and advisory services to such corporations, *provided*; that the rendition of such services shall not in any manner or to any extent whatsoever interfere with the services to be rendered by him to the Company pursuant to this Agreement.
    "(b) The option hereby granted shall terminate, and be of no further force and effect, at the close of business on December 31, 1958, unless prior to that time, (i) the Optionee shall have disposed of his entire interest, direct or indirect, in Plywood, Benton and Spring Creek and (ii) shall have established his principal residence in the metropolitan area of Portland, Oregon * * *" (G-P's Pacific Northwest headquarters).

3. The notice of the annual meeting referred to the option as follows:
    "(3) Considering and ratifying the action of the Board of Directors of the Company in granting options to Robert B. Pamplin, John S. Brandis, and H. Stuart Daniels to purchase Common Stock of the Company, as described in the annexed Proxy Statement * * *."
    The proxy statement described the option as follows:
    "On February 7, 1956, the Company also entered into an option agreement with Mr. John S. Brandis pursuant to which he was granted an option to purchase up to 10,000 shares of the Company's Common Stock on terms and conditions similar to those described above with respect to the option agreement between the Company and Mr. Pamplin. Mr. Brandis, a Vice-President of the Company, is in charge of the timber and logging division."

plant was adjacent to timber G-P had acquired from Coos Bay and was suitable for the manufacture of white speck veneer. It could also be converted to a plywood plant for about $1,500,000. G-P and Textron agreed upon a price of $600,000, but for tax reasons a lease option contract was executed which required G-P to pay $9,000 a month rental with 60 per cent of the payment to apply on the purchase price. At this time G-P had not decided how it would utilize either this plant or its white speck timber.

In January, 1958, Owen Cheatham, now chairman of G-P's board of directors, proposed to the Board that G-P enter into a joint venture with Venco (Plywood and its subsidiaries) for the utilization of the white speck timber acquired from Coos Bay. He explained that Plywood had been processing such timber since 1953 and that its Corvallis sheathing plant could efficiently use veneers produced by the Norway plant. He stated that if Brandis were not the owner of Plywood, he would unhesitatingly recommend the joint venture. The Board discussed the proposal and then authorized the joint venture and a sublease of the Norway plant to Venco.

G-P thereafter sublet the Norway plant for a term of ten years at a rental of $5,000 per month, cancellable by either party on 12 months' notice. G-P also sold its white speck timber in Coos County to Venco for $1.00 per thousand board feet plus 50 per cent of Venco's net profit before taxes from the sale of white speck sheathing. This timber sale, which provided for a base stumpage plus 50 per cent of the profit, was the basic element of the joint venture.

By October, 1958, additional production facilities were needed to accommodate all of G-P's white speck timber in Coos County. G-P's Board, therefore, authorized construction of a veneer plant at Powers, Oregon, for Venco's use. This plant cost G-P $672,903 and was sublet in July, 1959, for $71,019 per year. Either party could cancel on 12 months' notice.

G-P acquired an additional 146,000 acres of timber in Lane and Douglas Counties, Oregon, when it purchased the Booth-Kelly Lumber Company in August, 1959, for 93 million dollars. This timber also contained substantial quantities of white speck and the joint venture was expanded to include the timber acquired from Booth-Kelly.

The Booth-Kelly purchase also necessitated new processing facilities. In October, 1959, G-P bought a veneer plant at Creswell, Oregon, for $205,000 and leased it to Venco for $34,000 per year with the usual cancellation provision. With this increase in veneer production, Venco had to increase its sheathing facilities. So that it could acquire another sheathing plant in Corvallis, G-P loaned it $300,000 at five per cent interest. G-P took an option to purchase this plant at Venco's cost less depreciation.

When the joint venture between G-P and Venco was initiated in 1958, G-P extended the date by which Brandis had to sell Plywood and its subsidiaries from December 31, 1958 to December 31, 1959. When expansion of the joint venture to include the Booth-Kelly acquisition was approved by G-P's Board on October 28, 1959, all of the conditions in paragraph 15 of the option agreement were waived. Brandis was no longer required to dispose of his interests or move to Portland. G-P believed it was to its advantage to have Brandis retain control of Plywood because of G-P's large investment in the joint venture.

In January, 1960, Owen Cheatham suggested to Brandis that he sell Plywood and its subsidiaries to G-P. Brandis asked for time to consider it. Later, when Pamplin urged Brandis to sell, Brandis offered to exchange all of the Plywood stock for 75,000 shares of G-P. Pamplin suggested 50,000 shares at the time of purchase and 25,000 additional shares in the future under an earnings formula. By this formula, Brandis would receive 100 shares for each $5,000 of Plywood's annual net profit after taxes in excess of $500,000. The profit would be calculated over three 12-month periods

ending April 30, 1961, 1962 and 1963. Brandis agreed.

At G-P's board meeting on April 27, 1960, Owen Cheatham stated that the market for ungraded plywood sheathing now justified G-P's entering the field. This could be accomplished by cancelling the existing lease and timber cutting arrangements with Plywood and entering the field directly. As an alternative, he outlined the proposed purchase of Plywood for 50,000 shares of G-P stock with an additional 25,000 shares to be delivered to Brandis under the earnings formula upon which Pamplin and Brandis had agreed. The directors considered a financial analysis of Plywood consisting of a profit and loss statement for the period ending December 31, 1959, a balance sheet as of February 29, 1960, and a pro-forma profit and loss statement for 1960.

The 1959 profit and loss statement showed a net profit of $291,447 after taxes and the division with G-P.

The balance sheet listed total assets of $5,216,892, current assets of $2,493,650, current liabilities of $2,358,106 and an earned surplus of $996,779. It showed a total obligation to G-P under the timber cutting and lease agreements of $1,029,383. This was shown separately and was not carried either as current liability or long-term debt.

The 1960 pro-forma statement estimated Plywood's net profit at $1,047,635 for the year. This figure was based upon an anticipated increase in net sales from 13.3 million dollars to 21.9 million dollars and a price of $64 per thousand board feet for white speck sheathing. Mr. Harry Kane, G-P's financial vice-president, prepared the pro-forma statement. He estimated the price of sheathing for the balance of the year by checking Plywood's actual billings for previous months, by consulting with G-P personnel who were familiar with sheathing prices, and by talking to Brandis and Plywood's salesmanager.

The directors also considered a valuation of Plywood's two major plants by

the man in charge of construction for G-P. He made a personal inspection of the plants and estimated their replacement value at $4,000,000.

The directors discussed both the exchange agreement and the cancellation of the existing arrangements with Plywood. They approved in principle the exchange agreement and authorized the officers to prepare a contract for submission to the Board's executive committee. This committee was authorized to consummate the transaction on substantially the same terms presented at the directors' meeting. The directors also authorized the construction of a veneer plant at Row River, Oregon, to be leased to Venco for the utilization of additional white speck timber from the Booth-Kelly lands.

Plywood later submitted a balance sheet and profit and loss statement for the period ending April 30, 1960. The balance sheet varied only slightly from the earlier one, but the profit and loss statement showed that profits for the nine-month period ending April 30 were only $143,629. This would equal approximately $195,505 on an annual basis.

G-P's executive committee met on May 26, 1960, and determined the value of the outstanding shares of Plywood to be $4,152,500. At this time, 50,000 shares of G-P stock were worth approximately $2,700,000 and 75,000 shares approximately $4,000,000. The committee approved a contract for the purchase of Plywood. This contract expressed the earnings formula as follows:

"On or before May 31, 1961, 1962, and 1963, respectively, G-P will issue additional shares of its Common Stock, at the rate of 100 shares for each $5,000 of net profit of Plywood in excess of $500,000 of net profit earned by Plywood in the 12-month period ending on the next preceding April 30 * * *."

Arthur Anderson & Co., G-P's accountants, subsequently advised the corporation that for accounting purposes it

would be desirable to issue the 75,000 shares of stock initially and then provide for the return of 25,000 shares if Plywood's profit did not meet the earnings test. Owen Cheatham presented the executive committee with a revised agreement embodying this change and an escrow contract covering the 25,000 shares to be earned out. Section 4.3 of the revised agreement changed the earnings formula to read as follows:

"Each Stockholder (of Plywood) agrees that if the net profit of Plywood and its subsidiary consolidated, for the 12-month periods ending April 30, 1961, 1962 and 1963, respectively * * * is less than $916,667, certain of the shares of Common Stock of G-P issued and delivered to such stockholder on the Closing Day, shall be assigned and transferred to G-P, the aggregate number of shares to be determined by the extent of the deficiency but in no event to exceed 25,000. For the purpose of securing performance of this agreement, the Stockholders (of Plywood) will execute and deliver with * * * [escrow depository] * * * an Escrow Agreement in the form annexed hereto * * * and each deposit thereunder the number of shares of Common Stock of G-P therein provided to be deposited by him or her * * *."

The annexed escrow agreement provided:

"The Deposited Shares shall be held and disposed of by the Escrow Depository as follows:

"(a) On May 31, 1961, there shall be delivered to the Depositors one of the Deposited Shares for each $50 by which the net profit of Plywood Products Corp. * * * for the 12-month period ended on the preceding April 30, shall exceed $500,-000."

Subparagraphs (b) and (c) contain similar provisions for the periods ending April 30, 1961, and April 30, 1962, re-

spectively. Subparagraph (d) provides that:

"On May 31, 1963, all of the Deposited Shares which are not deliverable to the Depositors pursuant to the provisions of subparagraphs (a), (b) and (c) of this paragraph 1.2, shall be delivered to G-P * * *."

The executive committee approved the revised contract and the annexed escrow agreement. They were then executed by Plywood's stockholders and by Pamplin on behalf of G-P. Later, the exchange was approved by G-P's board of directors.

The figure $916,667, which appears for the first time in the revised agreement, equals the sum Plywood would have to earn each year in order for the 25,000 shares to be delivered to Plywood's stockholders equally over the three-year period. In other words, Plywood would have to earn a total of $2,750,000 (3 x $916,667) in the entire period for all of the deposited shares to be earned out. This total is the same as that required under the original contract ($500,000 x 3 plus 25,000 x $50 equals $2,750,000).

The escrow agreement annexed to the revised exchange contract restates the earnings formula in language identical to the original contract.

G-P has operated Plywood as an independent subsidiary since the purchase. Its profit for the first 12-month period was less than $500,000 and none of the G-P stock was released by the escrow depository.

## I. STOCK OPTION

G-P is a Georgia corporation whose officers and directors are bound by Georgia law. Subject to restrictions in the corporate charter or by-laws, the directors have authority to exercise all corporate powers.[4] One such power is "to create and issue * * * options, entitling the holder thereof to purchase from the corporation any share of its capital stock * * *."[5] G-P's charter

---

4. Ga.Code Ann., tit. 22, § 1864.

5. Ga.Code Ann., tit. 22, § 1828(i).

specifically grants the directors power to create and issue stock options.[6]

The principal reason G-P obtained stockholder ratification of the Brandis option, although ratification was not required by Georgia law or the corporate charter, was to comply with the rules of the New York Stock Exchange. These rules require stockholder approval of options which are to be covered by previously authorized but unissued stock before such stock can be listed on the exchange.[7]

Plaintiff claims that Brandis' option to purchase 10,000 shares of G-P stock terminated on December 31, 1958, because Brandis did not comply with the conditions of paragraph 15 by that date. These conditions required him to sell his interest in Plywood and move to Portland. The option was ratified by G-P's shareholders, but the Board extended the period for compliance with these conditions at the inception of the joint venture with Venco. Later, the joint venture expanded and the Board waived compliance entirely. Plaintiff contends that the Board had no authority to modify or waive the conditions in paragraph 15 once the option was ratified by the stockholders.

■ While it is true that the directors of a corporation cannot obtain stockholder approval of their own options and later amend the terms to their personal advantage, Winkelman v. General Motors Corporation, S.D.N.Y.1942, 44 F.Supp. 960, 1003–1007, the Brandis option was to an officer of G-P who was not a director and who exercised no control over the directors. Unlike Winkelman, supra, there was no self-dealing involved with respect to the Brandis option. This fact also distinguishes the present case from Gottlieb v. Heyden Chemical Corp., 33 Del.Ch. 82, 90 A.2d 660 (1952). The other cases cited by plaintiff, which involve specific stockholder action to limit the power of the directors, are not in point here because there was no such action by G-P's stockholders.

■ G-P could have issued the Brandis option without ratification by the shareholders. Ratification was not required by charter or Georgia law and had G-P covered the option with shares purchased on the open market or treasury shares, the New York Stock Exchange would not have required shareholder approval. G-P could have cancelled Brandis' option and issued him a new option without stockholder action.

Under these circumstances and because the conditions in paragraph 15 were not mentioned in the notice to stockholders or discussed in the meeting at which the options were ratified, the directors had authority to modify and waive these conditions without stockholder approval.

## II. THE JOINT VENTURE

Plaintiff contends that the joint venture between G-P and Plywood was a breach of Brandis' fiduciary duty to G-P because it diverted to Brandis one of G-P's corporate opportunities.

■ The Georgia statutes state that a minority stockholder must show fraud

6. G-P.'s charter provides in part:
"(k) The power to create and issue, whether or not in connection with the issue and sale of any shares of its capital stock or securities, rights or options entitling the holders thereof to purchase from the Corporation any shares of its capital stock of any class or classes (exclusive of the presently authorized $2.25 Cumulative Preferred Stock), upon such terms and at such time or times which may be limited or unlimited in duration, and at such price or prices as the Board of Directors shall determine * * *."

7. Section A7, N.Y.S.E. Company Manual, provides in part:
"* * * The Exchange is of the view that issuance of options to directors, officers or key employees, entitling them to acquire securities of the company, should be authorized by stockholders. Accordingly, stockholders' authorization in respect of options issued to directors, officers or key employees will be a condition prerequisite to authorization of the listing of the optioned securities, regardless of whether or not such authorization is required by law, or by the company charter * * *."

or gross mismanagement before a court will interfere with the directors' management of a corporation.[8] However, the courts of Georgia have imposed a fiduciary obligation upon corporate officers and directors. See Hurt v. Cotton States Fertilizer Co., 5 Cir. 1947, 159 F.2d 52, 58; Chalverus v. Wilson Manufacturing Company, 212 Ga. 612, 613, 94 S.E.2d 736 (1956). But the burden of proving a breach of duty rests upon the minority stockholder, even in cases in which there has been self-dealing by officers or directors. Regenstein v. J. Regenstein Co., 213 Ga. 157, 97 S.E.2d 693 (1957); Ga.Code Ann., tit. 22, §§ 710–711.

No Georgia case recognizes the corporate opportunity doctrine. However, Regenstein v. J. Regenstein Co., supra, indicates that the doctrine, even if recognized, would be narrowly applied. In that case, a minority stockholder alleged that the Regenstein Co. operated an unprofitable retail store solely to benefit a corporate officer and director who owned the premises and who leased them to the corporation. The plaintiff also claimed that three other officers and directors owned a competing store which diverted business from the company's store. The trial court sustained a general demurrer to the complaint. On appeal the judgment was affirmed. The court held that there was no prohibition against an officer or director leasing property to a corporation and that an officer or director is free to compete with a corporation so long as he breaches no legal or moral duty to the company; but he may not wrongfully use the corporation's re-

sources therein. 213 Ga. at 162, 97 S.E. 2d at 696.

In the present case, Brandis disclosed his interest in Plywood to G-P when he joined the company. He later purchased all of its outstanding stock and he disclosed this to G-P. More important, when it appeared that substantial quantities of white speck timber were acquired in the Coos Bay purchase, Brandis urged G-P to manufacture white speck sheathing. He conducted G-P's management through Plywood's sheathing facilities and offered to make them available. G-P did not accept this offer because of the opposition of its own sales and production personnel. With all of this information and after a full disclosure of Brandis' interest in Plywood, G-P's Board authorized the joint venture.

Thus, there was a complete disclosure to an independent Board and a tender of the opportunity to manufacture white speck sheathing before Brandis' corporation undertook the joint venture. This discharged his fiduciary duty to G-P and distinguishes the present case from those cases in which the corporate opportunity doctrine has been applied. In Irving Trust Co. v. Deutsch, 2 Cir. 1934, 73 F. 2d 121, the directors of a solvent corporation were not permitted to take advantage of a corporate opportunity where the corporation was unable to raise funds to make the purchase. However, in that case the court found that stronger efforts might have been made to procure funds and that one director owed the corporation a substantial debt which, if it had been paid, would have enabled the corpo-

---

8. Ga.Code Ann., tit. 22, § 710, provides in part:
   " * * * So long as the majority of stockholders confine themselves within the charter powers, a court of equity will require a strong case of mismanagement or fraud before it will interfere with the internal management of affairs of a corporation. (76 Ga. 641; 171 Ga. 544, 545 (156 S.E. 313).)"
   Section 711 of the Georgia code provides in part:
   "A minority stockholder may proceed in equity in behalf of himself and other

stockholders for fraud or acts ultra vires against a corporation, its officers and those participating therein, when he and they are injured thereby. But there must be shown— * * *
   '2. Such a fraudulent transaction completed or threatened among themselves or stockholders or others, as will result in serious injury to the company or other stockholders; or,
   "3. That a majority of the directors are acting in their own interest in a manner destructive of the company, or of the rights of the other stockholders; * * *."

ration to make the purchase. 73 F.2d 121, 124. In Guth v. Loft, Inc., 23 Del. Ch. 255, 5 A.2d 503 (1939), the president of Loft, Inc., used corporate facilities to develop his own competing enterprise. Although the Board had rejected the opportunity, the court found that the president dominated this Board. Rosenblum v. Judson Engineering Co., 99 N.H. 267, 109 A.2d 558 (1954), held that a complaint based upon loss of a corporate opportunity stated a cause of action, but also stated that one of the issues at trial would be whether this opportunity should have been tendered the corporation. 99 N.H. at 273, 109 A.2d at 563.

Although plaintiff contends that G-P should have manufactured white speck sheathing itself following its purchase of Coos Bay in July, 1956, there were valid business reasons for arranging the joint venture. G-P had no experience in the manufacture or sale of white speck sheathing. Its production and sales personnel opposed such an operation. The DFPA refused to certify white speck sheathing. Plywood, on the other hand, was one of the most successful white speck operators in the Pacific Northwest. The joint venture allowed G-P to benefit from this experience and reduced its initial expense and risk. As Mr. Samuel Swint, a member of G-P's Board put it, "In introducing any new item like this, if you can learn to shave on somebody else's face it is a pretty good idea to do it."

G-P's risk did increase as it acquired additional facilities for the joint venture. The veneer plants at Norway, Creswell and Powers, combined with the $300,000 loaned to Venco for the purchase of another sheathing plant in Corvallis, represent an investment of approximately $1,-700,000. The additional facilities, however, were necessitated by G-P's expanding timber operations and were profitable. In 1958, the joint venture returned a $738,217 profit to G-P and in the 9-month period ending September 30, 1959, it returned $600,000.

The decisions relating to the joint venture were within the business judgment of G-P's Board. They discussed each step in the operation and considered alternative plans for the utilization of the corporation's white speck timber. There was no showing of fraud or gross mismanagement by the directors. Absent such a showing, this court has no power to interfere with the internal management of the corporation. Ga.Code Ann. tit. 22, §§ 710, 711; Regenstein v. J. Regenstein Co., 213 Ga. 157, 97 S.E.2d 693; Bartow Lumber Co. v. Enwright, 131 Ga. 329, 62 S.E. 233 (1908).

### III. G-P's PURCHASE OF PLYWOOD

■ Plaintiff contends that the price G-P paid Brandis and his family for Plywood was excessive.

Georgia law provides that: " * * * in the absence of fraud the valuation of property or services by the directors accepted in payment of stock shall be conclusive * * *." Ga.Code Ann., tit. 22 § 1831. Other courts interpreting similar statutes have held that failure to exercise an honest business judgment is tantamount to fraud. See, e. g., Rugger v. Mt. Hood Electric Co., 143 Or. 193, 20 P.2d 412, 21 P.2d 1100 (1933).

G-P's Board fixed the value of Plywood at $4,152,500. It agreed to transfer to Brandis immediately 50,000 shares of G-P stock worth approximately $2,700,-000 and made another 25,000 shares available under an earnings formula. If all of these shares are earned out, G-P will have transferred to Brandis shares worth approximately $4,000,000.

The Board considered a financial analysis of Plywood and a valuation of its major physical facilities before fixing its value. It also considered Plywood's balance sheet and its 1959 earnings.

At the trial, an investment banker with long experience in the valuation of timber products corporations testified that Plywood was worth six million dollars to G-P. His figure was based upon the same financial data considered by the directors and a 15 to 1 capitalization of Plywood's 1959 earnings. In addition, an independent consulting engineer testified that Plywood's major plants had a re-

placement value of $4,080,000. Plaintiff offered no evidence of Plywood's value.

Plaintiff argues that the 1960 pro-forma estimate of Plywood's profit was highly optimistic and that G-P's Board did not consider Plywood's shortage of working capital or the declining income shown in its April 30, 1960, profit and loss statement. Moreover, Plywood would have been in a very difficult position had G-P cancelled its leases and cut off the company's source of raw material. Since the facilities of both companies had been integrated during the joint venture, a severance of the relationship would have required each company to construct additional plants in order to maintain production.

The weight to be accorded these factors was for G-P's Board and not for this court. Brandis was not a member of the Board and exercised no control over it. None of the Board members owned an interest in Plywood. There has been no evidence of fraud or of a failure to exercise an honest business judgment in the valuation of Plywood. Under Georgia law, therefore, the directors' valuation is conclusive. Ga.Code Ann., tit. 22, § 1831.

## IV. THE EXCHANGE AGREEMENT

 Plaintiff seeks an order declaring that G-P is entitled to the return of 8,333 shares of stock now in escrow because Plywood's profits were less than $500,000 for the period ending April 30, 1961. He also seeks to obtain a declaration that any stock not earned out in the two following 12-month periods be returned to G-P at the close of each period.

To grant such relief, this court would be required to read § 4.3 of the exchange agreement literally and without reference to the intent of the parties or to the escrow agreement. The attorney who prepared the agreement on behalf of G-P, the directors who authorized it, and the officers who executed it, all agree that they did not intend to change the earnings formula contained in the oral understanding and in the original exchange agreement with Brandis. They also testified that Brandis' belief that all of the stock could be earned out in any one year was their understanding also.

In the light of this undisputed testimony and the fact that the exchange and escrow agreements must be read together and construed so that each may have the effect intended by the parties, Kinney v. Schlussel, 116 Or. 376, 239 P. 818 (1925), I find that the exchange agreement permits all of the shares placed in escrow to be earned out in a single year. G-P is not entitled to the return of any stock because of the deficiency in Plywood's profit for the year ending April 30, 1961.

The foregoing opinion will serve in place of findings of fact and conclusions of law, in accordance with Rule 52(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A. However, the parties are not precluded from requesting additional findings.