Robert S. GAYNOR and Janet Stone, Appellants,

v.

James L. BUCKLEY, Julian N. Cheatham, Robert B. Pamplin, John S. Brandis and Georgia-Pacific Corporation, Appellees.

No. 18172.

United States Court of Appeals Ninth Circuit.

May 29, 1963.

Sidney L. Garwin, New York City, and Peterson, Lent & Paulson, Portland, Or., for appellants.

Koerner, Young, McColloch & Dezendorf and James C. Dezendorf, Portland, Or., and Shearman & Sterling, Robert Nias West and Thomas F. Fennell, II, New York City, for appellees James L. Buckley, Julian N. Cheatham, Robert B. Pamplin and John S. Brandis.

King, Miller, Anderson, Nash & Yerke, Robert S. Miller, Fredric A. Yerke, Jr., and Harvey C. Barragar, Portland, Or., for appellees Georgia-Pacific Corp.

Before BARNES, HAMLIN and DUNIWAY, Circuit Judges.

DUNIWAY, Circuit Judge.

Appellant Robert S. Gaynor, with appellant Janet Stone as plaintiff-inter-

venor, brought a stockholder's derivative action to cancel certain stock options issued by appellee Georgia-Pacific Corporation (G-P) to appellee John S. Brandis, one of its officers.[1] The other named appellees are members of G-P's board of directors.

The facts are not in dispute, and are more fully stated in the opinion of the trial court. (D.Ore., 1962, 203 F.Supp. 620) In brief, G-P hired Brandis as chief forester shortly after it began major operations in Oregon. Brandis was allowed to retain his interests in several lumber and wood-products companies, and he later increased these holdings. Early in 1956, Brandis was made a vice president of G-P, and its board voted to grant him an option to purchase 10,000 shares of G-P, over a six-year period commencing on January 1, 1958, at 95 per cent of current market price. The actual stock option (and employment) agreement was executed by G-P and Brandis on February 7, 1956, and ratified by the board on April 25, 1956. To insure Brandis' complete attention to the affairs of G-P, the agreement provided that the option was to terminate on December 31, 1958, unless Brandis by that date had disposed of his interests in his lumber and wood-products companies and had moved his home from Corvallis, Oregon, to Portland, G-P's regional headquarters.

G-P sought and received stockholder approval of the option agreement at its annual meeting on April 25, 1956. Neither the notice of meeting sent to the shareholders, nor the proxy statement which accompanied it, referred to the two conditions limiting the option;[2] and there was no mention of the conditions in the discusion of the option at the annual meeting. However, a G-P officer and director testified that the stockholders present at the meeting could have examined the full text of the agreement, if they wished.

New York Stock Exchange rules then in force required stockholder approval of stock option agreements before the optioned shares would be listed on the Exchange. There were some exceptions to this requirement, and a similar flexibility as to how much information on the terms of an option had to be furnished the stockholders before they voted.[3]

1. Appellants also sought an accounting of a joint venture between G-P and a group of corporations controlled by Brandis. The judgment against appellants on this claim is not appealed.

2. The Notice of Annual Meeting listed as an item of business: "(3) Considering and ratifying the action of the Board of Directors of the Company in granting options to Robert B. Pamplin, John S. Brandis, and H. Stuart Daniels to purchase Common Stock of the Company, as described in the annexed Proxy Statement * * *."

The Proxy Statement read in part: "On February 7, 1956, the Company also entered into an option agreement with Mr. John S. Brandis pursuant to which he was granted an option to purchase up to 10,000 shares of the Company's Common Stock on terms and conditions similar to those described above with respect to the option agreement between the Company and Mr. Pamplin."

The "terms and conditions" related to price, dates of exercise, and termination because of death, resignation, and retirement.

3. The New York Stock Exchange Company Manual, Section A 7, includes: "Disclosure to Stockholders: In connection with the above policy, it will be expected that all pertinent information then determinable in respect of such options, or in respect of the plan under which such options are issuable, will be disclosed to stockholders when there is first proposed to them the authorization of such options or plan, or any action implementing, or relating to, such options or plan.

The information which may be considered pertinent, and the amount thereof determinable when such authorization or action is first proposed to stockholders, may vary with the individual case. However, in general (and without attempting to define what may be considered pertinent in all cases), it would seem desirable and feasible to disclose to stockholders as the minimum, at that time, the intention to issue options, the per share purchase price fixed by the options (or formula for determination of such price), the aggregate number of shares for which options will be issuable and/or the period during which options may be issued, the classes

After the meeting, G-P listed shares of its unissued common stock on the Exchange to satisfy the Brandis option.

Thereafter, G-P acquired Oregon lands containing substantial quantities of fungus-infected Douglas fir timber, termed "white speck." Because the fungus impairs strength and market value, infected timber is often not utilized by the industry, but one of Brandis' companies had for some years been producing "white speck" veneers for the inner plies of plywood sheathing. Brandis convinced G-P that the timber should not be wasted, and G-P and a Brandis company entered into a joint venture under which the latter purchased this cull timber from G-P for one dollar per thousand board feet plus a percentage of the net profit, before taxes, from the sale of the sheathing.

Since G-P now stood to gain from Brandis' attention to, and retention of, his own holdings, the G-P board of directors on January 31, 1958, extended until December 31, 1959, the date by which Brandis must dispose of his outside interests and move to Portland. The scope of the joint venture later broadened considerably, and on October 29, 1959, the board completely waived Brandis' compliance with the conditions of the option. No attempt was made to obtain stockholder approval of either of these actions.

Appellants contended that G-P's board of directors could not waive the conditions of Brandis' option without consent of the stockholders, that Brandis had not performed the conditions, and therefore that the portion of the option not exercised by December 31, 1958, should be cancelled. The district judge disagreed, and so do we.

■■■■ Federal jurisdiction is predicated on diversity of citizenship of the parties; thus, state law rules. The issuance of stock options involves the internal affairs of G-P, and is governed by the law of the state of its incorporation, Georgia. (Rogers v. Guaranty Trust Co., 1932, 288 U.S. 123, 129–130, 53 S.Ct. 295, 77 L.Ed. 652; Elster v. American Airlines, Inc., 1953, Ct.Ch., 34 Del.Ch. 94, 100 A.2d 219, aff'd as to this point sub nom. Beard v. Elster, Del.Sup.Ct. 1960, 160 A.2d 731, 735). Subject to limitations in the corporation charter, the directors of a Georgia corporation may exercise all its corporate powers (Ga.Code Ann. § 22–1864), which include the power to issue stock options if the charter so provides. (Ga.Code Ann. § 22–1828(i)) G-P's charter so provided, "upon such terms * * * as the Board of Directors shall determine * * *."

Barring an abuse of their power, the directors of G-P could have authorized the option agreement without stockholder assent, and with or without the conditions here at issue. Appellants claim, however, that the powers of the board were limited both by G-P's relationship to the New York Stock Exchange and by

and number of persons to whom options may be issued, and the life of the options. Any information then available as to the conditions under which options may be exercised, terms of payment for shares covered by the options (including any amounts to be credited or debited in respect of the purchase price, or balances owing by optionees), maximum number of shares which may be optioned to any one person and provisions for amendment of the plan should also be disclosed to stockholders.

Exceptions to Above Policy: Exception may be made to the above-stated policy requiring stockholders' authorization of options in a case where options are issued under a plan in which all, or substan-

tially all, of the company's employees participate, depending upon the maximum amount issuable to any one individual under the plan and the proportionate distribution contemplated by the plan.

Exception may also be made in a case where options are issued to an individual, not previously employed by the company, as an inducement essential to his entering into a contract of employment with the company.

The Department of Stock List will be pleased to advise whether, in the light of the circumstances attaching to a particular case, Exchange policy requires authorization by stockholders as a condition of listing."

stockholder ratification of the conditional option.

■ Appellants argue that the rules of the Exchange made stockholder approval mandatory, both of the option and of any change in the option. The trial court rejected this argument because "had G-P covered the option with shares purchased on the open market or treasury shares, the New York Stock Exchange would not have required shareholder approval." (203 F.Supp. at 626) Appellants here point out that this is not what G-P did. We think what the trial court meant is that the New York Stock Exchange does not legislate for the state of Georgia. The rules of the Exchange might prevent G-P from satisfying the option by listing stock upon the Exchange (but see note 3 supra), but they do not limit the power of G-P's directors to authorize the option in the first place. A refusal to list optioned shares would only force G-P to resort to the methods suggested by the trial court.[4]

■ Appellants next contend that the conditional agreement, once ratified by the stockholders, could not be modified by the board of directors.[5] We need not reach this question. We hold that the two conditions were not ratified by G-P's stockholders because they never had knowledge of them. (See Alward v. Broadway Gold Mining Co., 1933, 94 Mont. 45, 20 P.2d 647; Iback v. Elevator Supplies Co., Ct.Ch., 1935, 118 N.J.Eq. 90, 177 A. 458; cf. Butler v. Standard Guaranty & Trust Co., 1905, 122 Ga. 371, 50 S.E. 132; Newton v. Gulf Life Ins. Co., 1937, 55 Ga.App. 330, 190 S.E. 69)

The information received by all stockholders did not recite the conditions, and no mention of them was made at the annual meeting. It is true that an inquisitive stockholder actually present at the meeting could have ascertained the conditions by inspecting the option agreement. We note, however, that there were about 30 stockholders present, but more than one million votes cast, by proxy as well as in person, on the resolution to grant the option. The conditions here were, at most, somewhat favorable to the stockholders' interest in having an effective corporation, and, at the least, neutral. But it is not impossible to imagine secret conditions favoring the option-holder at the expense of the corporation, and we would not erect a precedent which might bind stockholders by their unknowing ratification.

Since the conditions were never ratified, the board of directors could waive them without consulting the stockholders.

Affirmed.

4. Appellants do not directly argue that any federal statute required submission of the stock option agreement, or its amendment, to the shareholders. They do point out that, once a matter has been submitted to a shareholder vote, a report of this must be filed with the Securities and Exchange Commission. (See 17 C.F.R. § 240.13a–11 (1949), requiring Form 8–K, which includes a report of "Submission of Matter to a Vote of Security Holders.") G-P duly filed its report. Appellants note that submission to shareholder vote exempts the option-holder from the operation of Section 16(b) of the Securities Exchange Act of 1934. (15 U.S.C. § 78p (b), as modified by 17 C.F.R. § 240.16b–3 (Supp.1963)) Mr. Brandis' liability is not in question here. Appellants also point to miscellaneous federal provisions regulating securities transactions.

We cannot construct a federal law to fit the situation from such vague sources.

5. Compare Winkelman v. General Motors Corp., S.D.N.Y., 1942, 44 F.Supp. 960, and Gottlieb v. Heyden Chem. Corp., Sup. Ct., 1952, 33 Del.Ch. 82, 90 A.2d 660, on reargument, 33 Del.Ch. 177, 91 A.2d 57, with Beveridge v. New York Elevated R. Co., 1889, 112 N.Y. 1, 19 N.E. 489, 2 L.R.A. 648, and Amdur v. Meyer, 1962, 15 A.D.2d 425, 224 N.Y.S.2d 440, appeal pending, 11 N.Y.2d 1051, 230 N.Y.S.2d 206, 184 N.E.2d 179.