**Larry H. ROBINSON and Florence L. Robinson, Plaintiffs,**

**v.**

**MALHEUR PUBLISHING CO., William E. MacKnight and E. Madeline MacKnight, Defendants.**

**Civ. No. 66–180.**

United States District Court
D. Oregon.

Jan. 11, 1967.

Frederic A. Yerke, Jr., King, Miller, Anderson, Nash & Yerke, Portland, Or., and Martin P. Gallagher, Ontario, Or., for plaintiffs.

Roy Kilpatrick, John Day, Or., and Max S. Taggart, Ontario, Or., for defendants.

58

## OPINION

KILKENNY, District Judge:

Plaintiffs, shareholders in Malheur Publishing Co. (Malheur), the publisher of a newspaper in Ontario, Oregon, here challenge, as minority stockholders, the issuance of 10,000 shares of the capital stock of the corporation, on the ground that the consideration was so grossly inadequate as to amount to a fraud.

Malheur is primarily engaged in the publication of a newspaper known as the Argus-Observer. William F. MacKnight is president and chief executive officer of Malheur and he and his wife have always owned a majority of its capital stock. Plaintiff, Larry H. Robinson, is the publisher of the Independent Enterprise, a newspaper in Payette, Idaho, but at the times here in question, was the editor of the Argus and the holder of 6,000 of the 28,000 outstanding shares of Malheur. The Argus was acquired by Malheur in the fall of 1962 for the sum of $130,000.00. At that time, the Robinsons and the MacKnights agreed that MacKnight would own capital stock on the ratio of 3 to 1. Consequently, he purchased 18,000 shares and Robinson 6,000 shares, all of a par value of $1.00 per share. Later, 3,000 shares were sold to employees. For working capital, MacKnight loaned Malheur $35,000.00. The balance of the purchase price by Malheur was placed on a long time installment contract.

At first, the venture was a success. In 1964, the management purchased and installed an offset press at great expense, the majority of which was subject to long term financing. Moreover, the Argus was, at this time, faced with exceptionally strong competition from a local radio station and a new publication which was sponsored by radio station employees. By January of 1965, Malheur was faced with a financial crisis and MacKnight and Robinson attempted to improve the cash position of the corporation by a sale of additional capital stock. Adam J. Kalb, a publisher of two other newspapers in Idaho, and the president of three corporations which were affiliated with Scripps League Newspapers, a large group of twenty-six newspapers in the Rocky Mountain and Pacific Northwest areas, was approached as a prospective purchaser. Previously, Kalb had discussed with MacKnight the possibility of buying Malheur, but he was not interested in purchasing stock when approached in early 1965. However, he continued to express an interest in the purchase of Malheur throughout the early months of that year. During this period, MacKnight conferred with many banks attempting to obtain a loan, but was unsuccessful. The banks were particularly concerned with MacKnight's large loan to Malheur and suggested that this loan be capitalized, at least in part, by the issuance of stock. A stockholders' meeting was held on April 9, 1965, at which time MacKnight informed the attending stockholders of the company's impaired financial condition and proposed that $10,000.00 of the indebtedness owing to him by the corporation be converted into 10,000 shares of stock. Of the 28,000 shares outstanding 22,000 shares voted in favor of the proposition. The plaintiffs voted against the proposal. Prior to the meeting, MacKnight suggested that plaintiffs buy the stock at a price of $1.00 per share and even made an arrangement with a local bank, whereby plaintiffs could borrow money to buy the stock. Robinson, however, declined this offer. Previous to the above meeting, Kalb and MacKnight had been fencing back and forth in connection with the possible sale of Malheur to Kalb. It is clear that MacKnight was asking a sum substantially in excess of the original purchase price. Kalb made an offer of $275,000.00 for all of the assets of the corporation, which would include good will. The only direct testimony in the record is that this offer was made on April 10th, the day after the stockholders' meeting. Kalb did not seem to be interested unless he bought the land and the building in which the newspaper was published. This was owned by MacKnight and the parties could not agree on a purchase price. While the negotia-

tions were going on after the stockholders' meeting, the chairman of the board of Scripps League visited the area and arrived at the conclusion that it would not support a daily newspaper, the Argus being a weekly publication.

■ Both plaintiffs and defendants rely on the provisions of ORS 57.106(3).[1] In construing the statute, I shall follow the rule stated in 1 Model Business Corporation Act, Annotated, § 18, ¶ 3.05, which divides "fraud" into three categories: (a) actual fraud, (b) constructive fraud, and (c) reasonable judgment rule.

As yet, the Oregon courts have not construed the phrase "absence of fraud" as used in the statute. The court had occasion to construe the parent of the present statute, Olson's Oregon Laws § 6872, which used the phrase "in the absence of actual fraud", in Atwell v. Schmitt, 111 Or. 96, 225 P. 325 (1924). There, the Court held that the statute required an "honest attempt" be made to determine the true value of the property or stock and that an honest mistake or poor judgment would be immaterial so long as the directors "act fairly and honestly by the corporation they profess to represent." A phrase in a Georgia statute, on the same subject, was construed by Judge Solomon in Gaynor v. Buckley, 203 F. Supp. 620 (D.Or.1962), aff'd 318 F.2d 432 (9th Cir. 1963). He found that other courts interpreting similar statutes have held that failures to exercise an honest business judgment is tantamount to fraud. Rugger v. Mt. Hood Elec. Co., 143 Or. 193, 20 P.2d 412, 21 P.2d 1100 (1933), supports this view. On the record, I find that defendants were guilty of neither actual nor implied fraud as those terms are generally understood. Consequently, I will look to the record to see if the MacKnights exercised an honest or reasonable business judgment in issuing the 10,000 shares in satisfaction of $10,000.00 of the indebtedness.

The Robinsons argue that no effort was made to ascertain the market value of the stock prior to its issuance. They urge that any investigation would have disclosed that the stock was worth from $3.50 to $4.00 per share. This argument is based entirely on the Kalb proposal of $275,000.00 as the purchase price. From this sum, plaintiffs subtract the indebtedness as of March 31st and come up with a figure of $97,151.00. Manifestly, a division of this sum by 28,000 shares would give a result far in excess of even what the plaintiffs claim.

■ With all due respect to the Ninth Circuit opinion in Rands v. United States, 367 F.2d 186 (9th Cir. 1966), an unaccepted offer does not establish value. This would be true even though the offer was fully understood and no conditions were attached, such as the dispute, between the parties, over accounts receivable and the sale of the building and land. Vol. 1, Orgel on Valuation 2d, § 148; State Highway Comm'n v. Fisch-Or., Inc., 241 Or. 412, 399 P.2d 1011, 406 P.2d 539 (1965); State By & Through State Highway Comm'n v. Morehouse Holding Co., 225 Or. 62, 357 P.2d 266 (1960), and State of Oregon v. Cerruti et al., 188 Or. 103, 214 P.2d 346, 16 A.L.R.2d 1105 (1950). While the offer was not admissible for the purpose of establishing value, I do believe the offer, insofar as it was valid, would be admissible for the purpose of determining whether the MacKnights exercised honest, or reasonable, business judgment in connection with the transaction. Likewise, the counter proposal of MacKnight would be admissible for the same purpose and could be used, and is here used, as an admission against interest. The evidence clearly shows that Kalb was interested in paying the figure of $275,000.00 only if he found that the town of Ontario and community was ready for a daily newspaper. His study proved otherwise. His estimate, in his deposition, of the fair market value of all of the assets on April 9th of $200,000.00

[1]. "In the absence of fraud in the transaction, the judgment of the board of directors or the shareholders, as the case may be, as to the value of the consideration received for shares shall be conclusive."

would be considerably less than the dollar a share which was actually paid by the MacKnights. Moreover, the book value of the stock at the time in question was only $0.49 per share. The record is undisputed that the plaintiffs, a few days before the stockholders' meeting, offered to sell to Kalb up to 4,000 shares of the stock at a price of $1.00 per share.

■ The entire record compels a finding that the MacKnights, and companion shareholders, other than plaintiffs, exercised honest, sound and reasonable business judgment in voting to reduce the indebtedness of Malheur by issuing the additional 10,000 shares of stock to the MacKnights. This record cannot support a finding of either actual or constructive fraud on the part of the defendants and, in particular, on the part of the Mac-Knights. Sound business judgment dictated that the corporate indebtedness to the MacKnights be substantially reduced. Otherwise, the necessary operating capital could not be obtained. The shares which were transferred to the Mac-Knights in lieu of indebtedness had no value in excess of $1.00 per share and I so find.

This opinion is adopted as my findings of fact and conclusions of law. Defendants are entitled to a decree of dismissal.